In the Matter of BEEKMAN-DOWNTOWN HOSPITAL et al., Respondents, v ROBERT P. WHALEN, as Commissioner of the Department of Health of the State of New York, et al., Appellants.

In the Matter of ASTORIA GENERAL HOSPITAL et al., Respondents, v ROBERT P. WHALEN, as Commissioner of the Department of Health of the State of New York, et al., Appellants.

First Department, March 31, 1977

2

*Donald B. da Parma* of counsel *(Breed, Abbott & Morgan,* attorneys), for Blue Cross and Blue Shield of Greater New York, appellants.

*Louis J. Lefkowitz,* Attorney-General *(Mark C. Rutzick* of counsel), for Robert P. Whalen and another, appellants.

*Jacob Imberman* of counsel *(Susan Rosenfeld* and *Bruce E. Fader* with him on the brief; *Proskauer Rose Goetz & Mendelsohn,* attorneys), for Beekman-Downtown Hospital and others, respondents.

*I. Leon Goodman* of counsel *(Solomon, Rosenbaum, Goodman, Reier & Ross,* attorneys), for Astoria General Hospital and others, respondents.

SILVERMAN, J. The State Commissioner of Health, the State Superintendent of Insurance, and Blue Cross and Blue Shield of Greater New York ("Blue Cross") (the commissioner, the superintendent, and Blue Cross are hereinafter referred to as "appellants"), appeal from an order and judgment of the Supreme Court which annuls the determination of the commissioner and superintendent certifying and approving revised 1974 index and payment rates calculated by Blue Cross

for payment to petitioners hospitals and remands the 1974 Blue Cross rates schedules for recalculation, certification, and approval.

The dispute relates to the rates to be fixed for payments by Blue Cross to petitioners hospitals for patient care for the year 1974.

Although couched in the usual article 78 terms of an attack on the determination as arbitrary, capricious, erroneous in law, and an abuse of discretion, the major contention of petitioners hospitals, sustained by Special Term, is that the rates as fixed by appellants violate a binding agreement, settling a prior litigation; that they are, in essence, a breach of contract. Specifically it is contended that these rates and the method of fixing them violate paragraph "3 (a)" of a certain Attachment claimed to form a part of the settlement agreement in September 1974, and that that Attachment, and specifically paragraph "3 (a)" thereof, constituted a binding agreement. In our view, paragraph "3 (a)" of the Attachment does not constitute a legally binding agreement but is a unilateral nonbinding statement of intention.

Identical agreements of settlement were entered into with about 55 hospitals in September, 1974. The form of the papers in connection with the settlements consisted of four parts:

(i) a document entitled "Settlement Agreement and General Release" (hereinafter "Formal Agreement") signed and acknowledged in or about September, 1974 by the respective hospital and Blue Cross;

(ii) an Exhibit "A" attached thereto stating interim rates of payments to be made to the hospital for 1974 within 10 days after the approval by the superintendent;

(iii) a paper dated July 24, 1974 entitled "Revision of Hospital Index Projection for 1974" (hereinafter the "Attachment"); and

(iv) another paper prepared by Professor Michael Gort entitled "Forecast of 1974 Price Index for Hospitals in Greater New York."

It is claimed that the revision here complained of is a violation of paragraph "3 (a)" of item (iii) above, the "Attachment." That paragraph reads as follows:

"3. (a) Inasmuch as the revised projection of the hospital index is based on incomplete data for 1974, it is the intention of the Plan to revise the 1974 index projection in 1975 when

complete data for 1974 is available. Such revised projection will be based on the actual movement of the components of the index for 1974 as compared with 1973." "Plan" in this context obviously means Blue Cross.

On its face, this is not language of bilateral agreement but rather of unilateral present intention—"the intention of the Plan." The distinction between a binding agreement and a nonbinding statement of intention is elementary and well understood by all lawyers.

It is clear that this language was not merely a loose way of stating an agreement. It appears in a memorandum prepared and dated two months before the settlement. Again, it is claimed to form part of a settlement of a large lawsuit involving many millions of dollars, a settlement pursuant to which $18,000,000 was to be paid almost immediately as an interim payment; and a comparable amount is said to be governed by this Attachment. (In accordance with the plan's statement of intention in the Attachment, an additional $9,000,000 has in fact been paid to the hospitals; and the present dispute involves a claim by the hospitals that they are entitled to still another $9,000,000 under the Attachment.) The parties were represented by lawyers in the negotiation and formalization of their settlement agreement. Those lawyers knew the difference between an agreement and a statement of intention.

That distinction becomes even clearer when one compares the Formal Agreement and the Attachment, both said to be parts of the same settlement agreement. The Formal Agreement is headed "Settlement Agreement and General Release." The Attachment is headed "Revision of Hospital Index Projection for 1974." The Formal Agreement recites the parties to the agreement and is signed by the parties to the agreement and acknowledged by the hospital. The Attachment recites no parties and is unsigned. The Formal Agreement repeatedly contains language of agreement: "The Hospital agrees to accept and the Corporation agrees to pay"; "the Corporation agrees to pay within ten (10) days." Nowhere does the word "intend" or "intention" appear in the Formal Agreement. The Attachment states only that "it is the intention of the Plan." As the Attachment was a unilateral memorandum, prepared in July, 1974, two months before the settlement agreement, it is not surprising that the memorandum did not use language of agreement between two parties. But if the parties to the

September 1974 settlement agreement were transforming the pre-existing July unilateral statement of intention into a binding contract, we should, at a minimum, find somewhere in the papers prepared in September, i.e., in the Formal Agreement, a statement that Blue Cross promises or agrees to calculate the final 1974 hospital Index by the method set forth in the July memorandum, or that the parties agree to settle on the terms set forth in the memorandum. There is no such statement or promise in the September agreement. The only reference in that agreement to the Attachment is obviously by way of explanation, a statement that the interim payments contracted for (and about which there is no complaint in the present appeal) "have been calculated in accordance with and subject to the method outlined in the attached document entitled 'Revision of Hospital Index Projection for 1974.' " We think it is clear that the binding agreement consists only of the Formal Agreement. The Attachment is merely explanatory material and a unilateral statement of intention.

In our view, this really disposes of the argument that the revised rates are a breach of the settlement agreement.

We would add that it is by no means clear that the rates as finally promulgated are inconsistent with even the statement of intention in paragraph "3 (a)" of the Attachment.

Under the Cost Control Act of 1969 (L. 1969, ch. 957), a "prospective" reimbursement system was established. (10 NYCRR 86.15 [a]; 86.16.) However, in fixing these rates, the commissioner was required to take into consideration "economic factors in the area in which the hospital * * * is located, the rate of increase or decrease of the economy in the area in which the hospital * * * is located". (Public Health Law, § 2807, subd 3.) The method used to accomplish this objective is not specified by the statute. Under the method used by Blue Cross, with the approval of the commissioner and the superintendent, a base rate is fixed and that base rate is then adjusted up or down by a percentage which represents the projected movement of selected indices deemed to be reflective of those elements of the hospital economy comparable to the general economy in the coming 12-month period. This percentage is referrred to as "the Hospital Index."

On this basis, rates were prospectively fixed in December, 1973 and January, 1974 for the calendar year 1974. However, with respect to the year 1974, there were special economic conditions which the parties recognized made it impossible to

fix fair rates wholly prospectively. At least two factors seemed likely to change during 1974 with consequences certain to be great but impossible to measure in advance. Federal wage and price controls were in effect at the beginning of 1974; it was unknown whether those controls would lapse or continue. In fact, they lapsed in April, 1974, with what turned out to be double digit inflation in the general economy. In addition, the contract between the hospitals and hospital workers, represented by Local 1199 of the Hospital Workers Union, was due to expire in June, 1974, at which time new wages would be negotiated; such wages represented a very large part of total hospital costs. At the beginning of 1974 it was of course not even known whether the labor negotiations would take place in a controlled or uncontrolled economy. Accordingly, it was determined to revise the index—the percentage of increase of the base rate—when actual movement of the economy would be known.

Apparently everybody recognized the need for such a revision. Blue Cross prepared for such a revision; hospitals brought a lawsuit; and a settlement of that lawsuit was arrived at, embodied in the agreement to which we have referred.

All parties contemplated that the original projections would be increased in two steps, with an interim payment as soon as the settlement was approved and certified by the commissioner and superintendent, and a final adjustment some time in 1975, when the figure as to the actual movement of the relevant portions of the economy in 1974 should be known.

The interim payment was provided for in the Formal Agreement, and some $18,000,000 was paid pursuant to it. The parties contemplated that the final adjustment to be made in 1975 would be determined by fixing a final index—the percentage of increase over the base rate—in 1975, on the basis of actual movement of prices for 1974. The present dispute is as to the method of calculating this final (and necessarily retrospective) index for 1974. (As calculated by appellants, this final index resulted in payment of another $9,000,000, over the $18,000,000, to the hospitals. The hospitals contend that that figure is still $9,000,000 too low.)

In principle, the index is arrived at by (a) taking certain components of hospital costs (b) giving them a *weight* deemed to represent their proportionate contribution to cost of patient care (c) then computing the projected (or actual) *percentage*

*amount* of annual increase in each of the components (d) applying that percentage increase to the weighted component and then adding the weighted percentages to arrive at the "Index," i.e., the over-all percentage by which the base rate is to be increased or decreased to arrive at the final rate.

Part of one of the component items of the hospital index was originally "fuel, power and related products" under the heading "Other goods." As it turned out, oil prices increased enormously and disproportionately in 1974. Accordingly, to prevent distortion of the whole index, Blue Cross in calculating the final index put fuel in a separate component and gave that component a *weighting* which it deemed appropriate to its actual contribution to total hospital cost rather than what Blue Cross described as a conventional weighting previously used. Of course such a change in *weighting* can and did have a countervailing effect to the change of factor (c), the *percentage* of price increase of a particular component; obviously if two variables are changed, the result will be different than if only one is changed.

It is the position of petitioner that under paragraph "3 (a)" of the Attachment, Blue Cross only had the right to change factor (c), the actual percentage change of each component, but not factor (b), the weight of that component.

One would suppose that if that was the intention, it should not have been difficult for skilled lawyers to say that the formula to be used for fixing the final index shall be the same formula that was used to fix the interim payments substituting only actual percentages of change of each component for the percentage factor used in the interim formula. Instead, paragraph "3 (a)" of the Attachment merely provided that the revised index projection "will be based on the actual movement of the components of the index for 1974 as compared with 1973." But "based" seems to mean little more than that due account will be taken of the actual movement of the components. And in that sense, recognition that change in price of oil was so gross as to require not only changes in percentage but in weight of the components seems to be one form of basing the revised index projection on the actual movement of the components of the index.

We do not think so general a statement of intention can prevent Blue Cross, the commissioner, and the superintendent from fixing rates which comply with the statutory mandate that rate schedules shall be "reasonably related to the costs of

efficient production of such service." (Public Health Law, § 2807, subd 3.)

We note that the commissioner and the superintendent were not named as parties to and did not sign the settlement agreement. The Formal Agreement did provide that the agreements to accept and pay the interim amounts were "subject to certification and approval" by the commissioner and superintendent. Such certification and approval were in fact made; but we see nothing to indicate that the commissioner or the superintendent took any definitive action binding themselves to any statements of intention contained in the Attachment.

While there was discussion at Special Term and in the briefs of the question whether the final calculation of the Index, based on movement of the general economy, violates the requirement that rates be fixed on a prospective basis (10 NYCRR 86.15 [a]), we do not think that issue is really in the case. Because of the unusual economic situation in 1974, all parties were and are agreed that final adjustments due to the inflationary movements of the general economy should be made in 1975 for 1974, i.e., retrospectively. The settlement agreements with respect to 1974 rates upon which petitioners base their case were executed in September, 1974, and were approved and certified by the commissioner and the superintendent in December, 1974. And all parties contemplated at that time that there would be a later adjustment—in 1975—of 1974 rates to take account of the actual movement of relevant portions of the general economy in 1974. The index about which the parties are in dispute is thus intended as a retrospective figure in that sense. The complaint of petitioners is not that this index was fixed retrospectively but that it was not fixed high enough. Indeed, petitioners could hardly object to such a "retrospectivity" because under it they have already received $27,000,000 and their complaint is that they should receive another $9,000,000 by their version of that retrospectivity.

Closely related to the objection we have stated is the objection to the change in the factor of depreciation. Previously, depreciation had been fixed as a percentage of certain of the cost components, including oil. With the enormous and disproportionate increase in the cost of oil, blind application of the previous formula would have resulted in a disproportionate and distorted increase in depreciation. Accordingly, appel-

lants, instead of basing the increase of depreciation simply on the percentage increase of particular other cost components, based the increase of depreciation on what is called actual historical depreciation.

We are mindful of the observation of Mr. Justice DOUGLAS, speaking for the United States Supreme Court in *Federal Power Comm. v Hope Natural Gas Co.* (320 US 591, 602 [1944]): "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. * * * It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences."

There has been no effort here by petitioners to show that the rates arrived at are unjust and unreasonable in their consequences. Instead, they have concentrated on an effort to show infirmities in the method employed to reach that result. The Special Term Justice indicated that it is just such "substitution of a virtuous formula for hard solutions" that contributes to the fact that "the cost of health care seems to rise steadily without noticeable increase in efficiency or level of care." Unlike Special Term, however, we do not think that appellants had bound themselves to a rigid formula and a method to reach the final rates without regard to whether the rates finally arrived at are just and reasonable and "however economically justifiable [appellants' actions] may have been."

We cannot say that the actions of the appellants were without rational basis.

Accordingly, the judgment appealed from should be reversed, on the law, and the petitions dismissed, without costs.

BIRNS, J. P., LANE and NUNEZ, JJ., concur.

Judgment, Supreme Court, New York County entered on September 29, 1976, unanimously reversed, on the law, and

vacated, without costs and without disbursements, and the petitions dismissed.