OPINION OF THE COURT
Jones, J.
We hold that, consistent with the principles of litigation settlement, both Blue Cross and the State officials affected, the Commissioner of Health and the Superintendent of Insurance, must be held to the terms of agreements which were executed in settlement of prior litigation between the parties.
With the enactment of the Cost Control Act of 1969 (L 1969, ch 957), a system of prospective calculation of reimbursement rates to cover hospital costs was substituted for what had previously been retrospective calculation of reimbursement, in an effort to curb the disturbing continuing rise of such costs. The rationale was that prospective determination of reimbursement rates would create both compulsion and an incentive to control costs of operation. Under such a system reimbursement would not be made on the basis of costs actually incurred, but on the basis of predicted costs determined in advance; there would be no reimbursement for actual costs which exceeded the prospective rate, while if operating costs could be kept below that rate the hospital could retain the difference.
In conformity with this system, in November, 1973 Blue Cross-Blue Shield of Greater New York (Blue Cross) submitted to the Commissioner of Health a formula for the year 1974 called the "Prospective Reimbursement Method Effective January 1, 1974”. On January 24, 1974 the commissioner certified the 1974 formula as reasonably related to the costs of efficient production; the Superintendent of Insurance approved the 1974 formula on January 31, 1974. Under the formula a hospital’s 1974 Blue Cross rate was calculated in three successive steps. First, a base year rate was established, founded on a hospital’s actual 1972 costs, subject to certain maxima and minima. In the second step the base year rate was adjusted to reflect estimated price changes from 1972 to 1973. In the third and final step the 1973 rate was projected forward ("trended” is the term used) to 1974 by applying a hospital index pro *129 jection. It is the proper calculation of this third step which is the subject of the present litigation.
The original 1974 hospital index projection was calculated by breaking down hospital costs into 13 components or cost groups and then weighting each component according to its percentage of total actual 1972 hospital costs. The weights were derived from the 1972 Uniform Financial Reports which the hospitals had filed with the commissioner and Blue Cross. Blue Cross then selected indices (termed "proxies”) reflecting elements in the general economy which reliably corresponded to comparable elements of the hospital economy. These proxies were used in estimating increases in the weighted hospital cost components. The projected percentage increase — or "movement” — in the proxies from 1973 to 1974 was computed by means of a three-year moving average. Schematically, then, hospital costs were analyzed by the weighting of the 13 components of cost along a vertical axis; each such component of cost was projected by the use of a proxy from the general economy along a horizontal axis.
Finally, to reach the ultimate hospital index projection, each weighted cost component was multiplied by the percentage figure which reflected the estimated movement of the corresponding proxy. The combination of the products of these 13 multiplications produced the original 1974 hospital index projection, 5.71% for teaching hospitals and 5.7% for other voluntary hospitals.[1]
As Special Term found and as respondents concede, the original 1974 hospital index projection was calculated on the assumption that Federal wage and price controls in effect at the beginning of 1974 would continue throughout 1974. The Federal controls, however, were lifted in April, 1974. The result was an immediate and severe increase in wages in the general economy as well as in the hospital economy. Thus, the hospitals were incurring costs in an uncontrolled economy but were being reimbursed on the basis of a projection predicated on a controlled economy.
When Blue Cross refused to recalculate the 1974 hospital index projection, in June, 1974 four voluntary hospitals instituted a class action article 78 proceeding challenging the *130 validity and accuracy of the 1974 hospital index projection and the resulting reimbursement rates (Matter of Mount Sinai Hosp. v Ingraham, Supreme Ct, NY County). In consequence of that litigation and related proceedings with respect to similar challenges to the 1973 Blue Cross rates,[2] a settlement was reached between the individual hospitals and Blue Cross with respect to 1974 reimbursement rates. The disposition of the present appeal turns on the effect now to be given the agreements evidencing this settlement.
Substantially identical settlement agreements were executed between each of a number of proprietary and voluntary not-for-profit hospitals and Blue Cross, subject to certification and approval by the commissioner and the superintendent. In each instance the settlement agreement was manifested in four documents: a three-page "1974 Settlement Agreement and General Release” and three attachments thereto — a two-page "Computation of 1974 Prospective Reimbursement Rates”, a four-page "Revision of Hospital Index Projection for 1974”, and a seven-page "Forecast of 1974 Price Index for Hospitals in Greater New York”. The terms of the settlement included a release by the hospitals of all claims against the commissioner, the superintendent and Blue Cross with respect to the original calculation of the 1974 reimbursement rates. In return, Blue Cross agreed to reimburse the hospitals for 1974 at rates recalculated to reflect actual movement during 1974 of the 13 weighted cost components (as contrasted with the original movement, which had been predicated on what had proved to be the erroneous assumption of continued Federal wage-price controls). Inasmuch as the actual movement of the proxies — and thus of the cost components themselves — during 1974 could not be known until sometime in 1975, the final recalculation of the hospital index projection had necessarily to be deferred. The settlement agreements accordingly provided for adjustment in two stages: There would be an immediate interim adjustment to the original rates to relieve the hospitals’ cash flow problems in part;[3] in the second stage the *131 final revision of the 1974 hospital index projection would be made in 1975 when the actual movement of the proxies for 1974 would be known. The present controversy relates to the calculation of this final adjustment.
In December, 1974 the 1974 settlement agreements (including the "1974 Settlement Agreement and General Release” and the three attachments) were certified by the commissioner and approved by the superintendent.
The economic data for 1974 on which calculation of the final adjustment was to be based became available during the first quarter of 1975, and in May of that year Blue Cross submitted its proposed final revision of the 1974 hospital index projection to the commissioner for certification. This projection was based on the prior formula with two modifications, one with respect to the "other goods” cost component, the second with respect to the "depreciation” cost component. In consequence of these two modifications the hospital index projection was substantially lower than would have been the case without such modifications. Blue Cross estimates that in round figures the modification of the "other goods” component reduced reimbursement to the hospitals by some $6 million and the modification of the "depreciation” cost component reduced reimbursement by; another $3 million.
In the original 1974 hospital index, as the proxy to measure the "other goods” cost component Blue Cross had used the average wholesale price indices in the general economy for the following four items: (1) textile products and apparel; (2) fuel, related products and power; (3) paper, pulp and allied products; and (4) furniture and household durables. In its final revision submitted to the commissioner, Blue Cross removed the fuel factor from both the cost component and the proxy. The fuel economic indicator in the general economy was used as proxy for a newly created 14th component of hospital costs labeled "fuel and related products”. This new cost component was weighted along the vertical axis by applying data taken from a New York State Health Department survey of hospitals’ 1973 direct fuel costs. (The original 13 cost components had been weighted according to 1972 data and covered indirect fuel costs as well.) The resulting "other goods” cost component (i.e., minus "fuel and related products”) was correlated to the proxy based on the remaining three price indices (textiles, paper and furniture). We are told that the effect of this modification was to halve the impact of fuel and fuel- *132 related costs in the computation of the final hospital index projection.
The other modification involved a change with respect to the proxy for the "depreciation” cost component. The original proxy for depreciation had been the weighted average of the proxies for all of the other nonsalary cost components (i.e., "Food”, "Drugs”, "Other Goods”, and "Other Services”). In its final revision, Blue Cross substituted as proxy the actual increase in historical depreciation of hospital plant and equipment. We are told that the effect of this modification was to reduce the percentage change in the depreciation cost component used to calculate the reimbursement rate to one fifth of what it would otherwise have been.
We immediately observe that it appears that each of these modifications made a good deal of economic sense. As to the first, during 1974 fuel prices had skyrocketed because of the international energy crisis. It was reasoned, and with apparent cause, that to continue the wholesale price index for fuel as one of the four indices used to determine the proxy for the "other goods” cost component would be grossly to distort that proxy and thus the projection percentage. The prior inclusion of fuel costs within the "other goods” cost component had been at least in part because there had been no data available as to the actual relative percentage of fuel costs to total hospital costs. Data becoming available in 1974 purportedly showed that fuel costs bore a much smaller ratio to total hospital costs than had previously been recognized. Accordingly Blue Cross factored out the item of fuel both from the cost component and from its corresponding proxy, with the dual effect of changing the "other goods” component and reducing the impact of fuel as a factor in determining the projection index.
By somewhat similar token, with respect to the depreciation cost component, the replacement of the prior proxy based on the combination of the proxies for the four nonsalary components by a new proxy based on actual increase in historical depreciation of hospital plant and equipment could certainly be expected to produce a correlation of much greater economic validity.
The hospitals took exception to the modification in the hospital projection index in these two respects. When Blue Cross and the commissioner and superintendent rejected their complaints, the present litigation ensued. Special Term upheld *133 the position of the hospitals, annulled the determinations of the commissioner and superintendent certifying and approving the revised projection index as submitted by Blue Cross and the reimbursement rates based thereon, and remanded the 1974 Blue Cross rate schedules for recalculation. The Appellate Division reversed and dismissed the hospitals’ petitions. We now, in our turn, reverse the Appellate Division and reinstate the judgment of Special Term.
What is at the heart of the present proceedings is the integrity of litigation settlement — shall Blue Cross and the two State officials who were parties to the prior litigation and participated in the settlements reached be held to perform the commitments on the basis of which that litigation was settled?
We reject the arguments now advanced in support of the conclusion that the commissioner and the superintendent are not bound by the terms of the settlement agreements. True, they were not signatory parties to the agreements, but the agreements were expressly made subject to certification and approval by them, and, as previously stated, in December, 1974 the settlement in all its constituent parts was certified and approved by each.
Nor is there any merit to the argument that the authority and responsibility of the State officials was statutorily limited to approval of specific rates of reimbursement and that neither had authority or power to commit himself in advance to approval of any methodology of rate fixing. On this premise it is contended that the commitment of the State officials went only to the first stage of the settlement, i.e., the $18 million of reimbursement immediately authorized, and could not and did not extend as well to the formula for the final reimbursement rate fixing for the year 1974. Subdivision 3 of section 2807 of the Public Health Law does indeed prescribe that the reimbursement rates shall be "reasonably related to the costs of efficient production of such service”. We, too, would find in that provision a connotation of continuing supervision such as to preclude a long-term commitment either to a particular rate or to a specified formula. We find nothing in the law, however, which precludes the State officials, incident to the settlement of pending litigation, from making a binding commitment to adhere to a specified rate or formula for a period of such duration as was involved here, when no claim is or could be made that such commitment is illegal or involves an impermissible delegation of the authority and responsibility of *134 those officials. Indeed to hold otherwise would be generally to deny the State officials the power to resolve litigation by settlement rather than by final judicial determination. From another perspective, it would ill become the State officials to accept the benefit of the general release of all claims against them in connection with payment rates for services rendered during the year 1974, without accepting the burden which commitment to the formula agreed on entailed.
We have little doubt that, in the absence of the constraints arising out of the settlement agreements, the State officials could have fixed the reimbursement rates based on the two modifications which they sought to make. Both appear economically sound and to be within the contemplation of section 2807. Had the State officials sought, however, to retain this degree of economic flexibility in fixing the final reimbursement rates for 1974, such reservation should have been set forth in the settlement agreements. We perceive no legal inadequacy in the authority of the commissioner and superintendent to enter into commitments to abide by the terms of the 1974 settlement agreements.
Turning then to the settlement agreements themselves, we can only conclude that the parties manifested an intention that the agreement comprise all four documents. Whatever degree of physical separateness might be said to exist, the three attachments constituted operative portions of the total agreement; otherwise there would have been little occasion to attach them. Nor do we find it of significance for present purposes that the "Revision of Hospital Index Projection for 1974” bore an earlier date or was cast in language of intention rather than of explicit commitment. We conclude that the settlement agreements were executed on the basis of the substantive provisions of this attachment and that its provisions became operative provisions of the settlement agreements.
Finally, we address the critical paragraph of the "Revision of Hospital Index Projection for 1974”: "3. a) Inasmuch as the revised projection of the hospital index is based on incomplete data for 1974, it is the intention of the Plan to revise the 1974 index projection in 1975 when complete data for 1974 is available. Such revised projection will be based on the actual movement of the components of the index for 1974 as compared with 1973.” We agree with the contention of the hospitals that by acceptance of this paragraph Blue Cross and the *135 commissioner and the superintendent engaged to calculate the final adjustment of reimbursement rates for 1974 by what Blue Cross characterizes as "blind application of economic data to pre-existing components as weighted in the old index and using the old proxies”. It was just this sort of specificity on which the settlement was based. Respondents make no contention that the modifications introduced by Blue Cross in its submission of the final hospital index projection conformed to such a specific formula. To hold, however, as Blue Cross argues, that there was agreement only that the "revised projection will be based on the actual movement of the components of the index for 1974 as compared with 1973”, thereby to permit continuing adjustment of the various elements "in an economically realistic fashion” without commitment to the same vertical weighting and the same horizontal proxies from the general economy, would result in a wholly illusory settlement. Blue Cross and the State officials would be free to fix reimbursement rates on relevant economic data, precisely as was their statutory obligation and responsibility, entirely without reference to any constraints placed on them in consequence of the settlement agreements. We cannot accept that this was the intention of the settling litigants; certainly they manifested no such intention.
For the reasons stated, the order of the Appellate Division should be reversed, with costs, and the judgment of Supreme Court reinstated.
Chief Judge Breitel and Judges Jasen and Fuchsberg concur with Judge Jones; Judges Gabrielli and Cooke dissent and vote to affirm on the opinion of Mr. Justice Samuel J. Silverman at the Appellate Division (57 AD2d 1); Judge Wachtler taking no part.
Order reversed, etc.
*136 [[Image here]]

. By way of illustration see the tables accompanying this opinion which were attached to the petition herein as the tables prepared by Blue Cross under the 1974 formula, showing the cost components, proxies and calculations for the 1974 hospital index projection originally submitted for certification and approval.

. (Matter of Presbyterian Hosp. in City of N. Y. v Ingraham, consolidated with Matter of Benedictine Hosp. v Ingraham, 78 Misc 2d 152, affd 49 AD2d 520, affd 39 NY2d 867.)

. This interim adjustment resulted in an upward revision of the hospital index projection from the original 5.7% to 9.45% for voluntary hospitals and produced a prompt payment to the hospitals of some $18 million. A similar benefit presumably was received by the proprietary hospitals, the precise dimensions of which are not disclosed in this record.