Arnold L. Fein, J.
Motions numbered 85 and 86 of February 18, 1976 are consolidated for disposition.
In these CPLR article 78 proceedings petitioners, voluntary and proprietary hospitals in the 17 southern counties of New York State, Sullivan, Ulster, Dutchess, Orange, Putnam, Rock-land, Westchester, Nassau, Suffolk, Columbia, Delaware, Greene, Kings, New York, Bronx, Queens and Richmond (metropolitan area), challenge the determination of respondents, the Commissioner of the Department of Health of the State of New York and the Superintendent of the Insurance Department of the State of New York, certifying and approving the 1974 trend factor revision and final hospital index submitted by respondent, Blue Cross Blue Shield of Greater New York (Blue Cross), by which the rates at which Blue Cross paid such hospitals for the year 1974 was determined. Each proceeding purports to be brought as a class action on behalf of the respective petitioners and similar hospitals in the affected area and requests the court to grant class action status.
Respondents move for an order pursuant to CPLR 602 directing joint disposition by consolidation or otherwise in New York County of the proceeding pending here (Matter of Beekman-Downtown Hosp. v Whelan, Index No. 20237/75) and the proceeding pending in Supreme Court, Albany County (Matter of Astoria Gen. Hosp. v Whelan, Index No. 20237/75) or alternatively dismissing one of the proceedings pursuant to CPLR 3211 (subd [a], par 4) and for a determination that these proceedings may not be maintained as class actions pursuant to CPLR 907 (subds 1, 6) and CPLR 901 (subd 5).
*326 So much of respondents’ motion as seeks an order transferring the Albany County proceeding to this county and consolidating it with the proceeding pending here is granted. Both article 78 proceedings involve common questions of law and fact concerning the lawfulness of the approval and certification by the Commissioner of Health of the State of New York (commissioner) and the Superintendent of Insurance of the State of New York (superintendent) of the Blue Cross rates of payment to petitioners in both proceedings for the year 1974 and the underlying determination of such rates by Blue Cross. Petitioners in the New York County proceeding are "voluntary” or not-for-profit hospitals in the metropolitan area. Petitioners in the Albany County proceeding are "proprietary” or for-profit hospitals in the same area. Petitioners in both proceedings not only challenge the same determinations made by the commissioner and the superintendent, but also base their claims upon the same "settlement agreement” with Blue Cross, subscribed to by all of the petitioners in the respective proceedings.
So much of respondents’ motion as seeks a determination that both proceedings should not proceed as class actions is granted and the cross motion by the voluntary hospitals for an order pursuant to CPLR 902 permitting this proceeding to be maintained as a class action defining the class as all "voluntary” hospitals located in the counties of Sullivan, Ulster, Dutchess, Orange, Putnam, Rockland, Westchester, Nassau, Suffolk, Columbia, Delaware, Greene, Kings, New York, Bronx, Queens and Richmond that have signed agreements with respondent Blue Cross settling a 1974 class action pending in this court is denied.
Class-action procedure is neither appropriate nor necessary. These are article 78 proceedings seeking orders annulling and setting aside the certification and approval by the superintendent and commissioner of Blue Cross’ rates of payment to hospitals in 1974 and directing that said respondents require Blue Cross to recompute such rates. The Court of Appeals has recently twice held that class actions in cases where governmental operations are involved are not necessary since comparable relief would adequately flow to others similarly situated under principles of stare decisis. (Matter of Rivera v Trimarco, 36 NY2d 747; Matter of Jones v Berman, 37 NY2d 42.) Although both of these cases were decided prior to the enactment of CPLR article 9, the new class-action statute, effective *327 September 1, 1975, that statute does not overrule these cases. Their rationale is equally applicable to the new statute as it was to CPLR 1005, the now repealed class-action statute. Nothing in the legislative history or the language of the new statute reflects such an intention. Similar to article 9, CPLR 1005, under which the court formulated this rule, had no specification that the class-action procedure was not applicable to special proceedings to review the administrative determinations of governmental agencies. However, the courts fashioned the rule on principles not affected by the new statute. It is inconceivable that the commissioner and the superintendent would not apply a court direction to all hospitals similarly situated, irrespective of whether they were parties to the action.
Accordingly, the court will disregard the class-action allegations of the petitions as unnecessary to a determination of the issues raised in the proceedings now consolidated with respect to the named petitioners.
Respondent Blue Cross, a nonprofit corporation, existing under article IX-C of the Insurance Law, provides hospital and health service prepayment coverage to approximately nine million subscribers in the metropolitan area, under the supervision of both the commissioner and the superintendent. Prior to 1969, Blue Cross reimbursed hospitals for services rendered to its subscribers by paying on a retrospective basis. At the end of each year the hospitals would be paid a sum based upon their actual cost in providing services at a rate certified by the commissioner and approved by the superintendent. There was said to be no incentive to keep costs down.
To control the spiraling costs, the Legislature enacted the "Cost Control Act of 1969” (L 1969, ch 957) substituting a "prospective” reimbursement system for the retrospective system of payment. Under the prospective reimbursement system, hospital payments are not simply the actual costs to the hospitals but rather are based upon estimates of cost which are established before the year to which they apply by projections based upon prior years’ actual costs. Thus, the theory goes, the hospitals have an incentive to control costs since they will not be reimbursed for actual costs incurred which exceed the prospective rate, but if they spend less than the prospective rate, they can keep the difference.
Before Blue Cross hospital reimbursement rates can go into effect, there must be certification and approval. "Prior to the *328 approval of such rates, the commissioner shall determine and certify to the superintendent of insurance and the state director of the budget that the proposed rate schedules for payments for hospital and health-related service * * * are reasonably related to the costs of efficient production of such service. In making such certification, the commissioner shall take into consideration the elements of cost, geographical differentials in the elements of cost considered, economic factors in the area in which the hospital is located, the rate of increase or decrease of the economy in the area in which the hospital is located, costs of hospitals of comparable size, and the need for incentives to improve services and institute economies” (Public Health Law, § 2807, subd 3).
The superintendent must then approve such certified rates (Insurance Law, § 254, subd 2).
The commissioner has promulgated administrative rules and regulations concerning "Reporting and Rate Certification for Medical Facilities” (10 NYCRR Part 86) and the "[computation of rates of payment by article IX-C corporations.” (10 NYCRR 86.2 [a]).
As required, the Blue Cross formula setting the prospective reimbursement rates for 1974 was certified by the commissioner and approved by the superintendent in January, 1974.
Under the terms of this formula, a hospital’s 1974 Blue Cross rate was to be determined in the following manner: a "base” rate equal to the actual per diem reimbursable hospital costs for the base year 1972 was established. The base rate was then "trended” forward to the next calendar year 1973 by adding to the base rate the estimated costs of the intermediate year (1973). The estimated "intermediate year” costs were derived from actual hospital operating data for the first nine months of 1973 and estimated costs for the remaining three months of that year. To the "intermediate year” per diem rate of each hospital, limited by the experience of comparable hospitals, there was applied a projected increase, derived by use of a "hospital index projection”, intended to determine each hospital’s prospective reimbursement rates for 1974. The calculation of this hospital index projection is the issue in dispute in these proceedings.
The original hospital index projection for 1974 was composed of various components of hospital costs. Those components were: (A) clerical salaries; (B) hotel service salaries; (C) professional and technical salaries; (D) physicians’ salaries; (E) *329 nursing salaries; (F) food; (G) drugs; (H) employee health and welfare (1) Social Security tax, (2) pensions, (3) Other; (I) other goods (1) fuel, power and related products, (2) textile and apparel, (3) furniture and household durables, (4) paper pulp and allied products; (J) other services; (K) depreciation, interest, rent, etc.
For each of these cost components, a so-called "proxy”, utilizing economic indicators, usually a price index, derived from the general economy or the health economy such as a wholesale price index for a particular product, was projected forward by means of a three-year moving average, to determine the prospective rate of increase of the cost component. Each cost component was then weighted on the basis of its percentage relationship to total hospital costs as derived from actual 1972 costs submitted by the hospitals to Blue Cross which weight was then applied to the percentage increase in the proxy to determine the over-all index projection or projected percentage increase. As noted, this 1974 method and index, as well as the reimbursement rates calculated thereunder, were certified by the commissioner and approved by the superintendent in January of 1974.
At the time this original 1974 index was submitted to and approved by the respondent commissioner and superintendent there were questions as to its validity arising from the fact it had been formulated on the assumption that wage and price controls would remain in effect through 1974. However, these controls were terminated in April, 1974, producing an immediate and severe increase in wages and prices in the general as well as the hospital economy. Despite the fact that the reimbursement rates based upon the 1974 index were causing hospitals serious financial problems, Blue Cross refused to adjust the 1974 index. Consequently, an action was instituted in June of 1974 by four voluntary hospitals on behalf of themselves and all other hospitals similarly situated against the commissioner, the superintendent and Blue Cross. The issue in that proceeding (Matter of Mount Sinai Hosp. v Ingraham, New York County was the validity and adequacy of the 1974 index.
That action was terminated by a settlement agreement between Blue Cross and petitioner hospitals, both "voluntary” and "proprietary” and other similar hospitals. Each hospital entered into an agreement and release. Each agreement consisted of: (1) a three-page portion entitled "1974 Settlement *330 Agreement and General Release”; (2) an attachment of two pages of rate computations showing the original 1974 rates and interim rates to be paid under the agreement; (3) an attachment of four pages dated July 24, 1974 entitled "Revision of Hospital Index Projection for 1974” which detailed the methodology for the calculation of the interim and final rates; and (4) an attachment of six pages and table entitled "Forecast of 1974 Price Index for Hospitals in Greater New York” prepared by Professor Michael Gort which described the computation of the interim rates.
The revision in the 1974 index and rates was to be made in two stages. In the first, increased interim rates were to be calculated in order to alleviate some of the critical hospital cash flow problems until such time as a final revision of the 1974 index and rates could be computed. In the second and final stage, actual 1974 data reflecting the actual movement of the original proxies for 1974 as compared with 1973 were to be incorporated into the original 1974 index. Thus, section 3 of that portion of the settlement agreement entitled "Revision of Hospital Index Projection for 1974” reads as follows: "Inasmuch as the revised projection of the hospital index is based on incomplete data for 1974, it is the intention of the Plan to revise the 1974 index projection in 1975 when complete data for 1974 is available. Such revised projection will be based on the actual movement of the components of the index for 1974 as compared with 1973.”
These settlement agreements, etc. were certified by the commissioner and approved by the superintendent during December, 1974.
Section 3 of the "Revision of Hospital Index Projection for 1974” demonstrates the intention of Blue Cross and the otherl parties to the settlement agreements that the original methodology for the calculation of the hospital index projection was to be used to project the 1974 rate from 1973 figures but that the original hospital index projection was to be adjusted to reflect the actual movement of price indices or proxies from 1973 to 1974.
Contrary to the position of the respondents, there was no basis in that settlement agreement to change the original hospital index projection itself. This, however, was done by Blue Cross when it submitted to the commissioner for certification in May of 1975 a revised 1974 index which changed the depreciation and "other goods” proxies ("K” and "I” respec *331 lively). The terms of the 1974 settlement provided for the continued use of these two proxies in their original form adjusted only to the extent of using the actual instead of projected increase in the proxies from the year 1973 to 1974. Instead of doing this, Blue Cross removed the wholesale price index for fuel from the computation of the "other goods” proxy of the index and established a new cost component for "Fuel and Related Products. ” This new fuel cost component and proxy in the revised 1974 index is the only cost component and proxy which is weighted on the basis of 1973 data. All of the others are weighted according to 1972 data. This procedure was contrary to the terms of the settlement agreement and inconsistent with the objectives of the Cost Control Act of 1969, albeit it resulted in a lower rate of reimbursement to the hospitals by Blue Cross.
With regard to "depreciation”, proxy "K” of the original index, Blue Cross substituted data which it claims represents the actual change in the historical depreciation of hospital plant and equipment for 1974. Instead of using a projection, Blue Cross has switched to a retrospective calculation of depreciation costs. Thus, Blue Cross has plainly violated the terms of the settlement agreements and appears to have ignored the intent and purpose of the prospective reimbursement system mandated by the Cost Control Act of 1969 and the regulations issued by the commissioner (10 NYCRR Part 86). These regulations refer to the use of historical depreciation in the calculation of base year costs, i.e., 1972, not as a factor in the trending of intermediate year costs to the final rate year.
Nonetheless, on July 14, 1975, the commissioner certified this revised 1974 index as consistent with article 28 of the Public Health Law and the 1974 settlement agreement. In October, 1975, he certified the revised 1974 rates calculated on this basis and the superintendent approved both the revised index and rates.
In summary, the 1974 settlement mandated the use of the original 1974 depreciation and the "other goods” proxies, which included "fuel” as a component, adjusted only to the extent of using the actual instead of the projected movement in such proxies for the final 1974 index. In return for waiving claims they might have in the pending lawsuit, petitioners were to receive payment on the basis of an agreed upon formula providing for adjustments to the rates payable. No *332 change, however, was contemplated in the use of the proxies or cost components of the original index. The action of Blue Cross in so doing was in violation of these agreements.
The question is whether the action of the commissioner and superintendent in certifying and approving this revised index was arbitrary and capricious, and without a reasonable or rational basis in the record.
The rationale for respondents’ action was twofold. During 1974 fuel prices skyrocketed because of the energy crisis. Since fuel was one of the four subcomponents of the "other goods” cost component in the index, it was apparently concluded that reflecting this increase in the "other goods” component would grossly distort the entire "other goods” component. The inclusion of fuel as part of the other goods cost component had previously been arbitrarily fixed at least in part because there were no data as to the actual relative percentage of fuel costs to total hospital costs. Data became available in 1974 purportedly showing that fuel costs bore a much smaller relationship to total hospital costs than had previously been considered. Accordingly respondents removed the fuel factor from the other goods component and weighted it to conform «to its actual percentage cost relationship in the hospital economy. This had the dual effect of changing the other goods component and reducing the impact of fuel as a factor in determining the index.
However economically justifiable this may have been, it was clearly a retrospective change in the formula which had been agreed upon by Blue Cross and the hospitals and approved and certified by the commissioner and superintendent. Similarly the substitution of actual historical depreciation of hospital plant and equipment for the prior formula was not contemplated by the agreement.
Without conceding that there was a deviation from the settlement agreement, the superintendent and the commissioner have justified their action upon the ground that the statute mandates that rates be "reasonably related to the costs of efficient production” of hospital services and that their obligation is to approve and certify such rates pursuant to the statutory standard (Public Health Law, § 2807, subd 3) and not according to a contractual standard.
Their obligation to do so is beyond dispute. However they were not writing on a blank slate. They had certified and approved the settlement agreement on which the hospitals *333 rely and pursuant to which the hospitals gave up certain rights. Presumably the commissioner and the superintendent approved the settlement agreement in the light of the statutory standards and not on an arbitrary and capricious basis. Undoubtedly such an agreement could neither require the commissioner and the superintendent to disregard the statutory standards nor justify such a departure. Nor could the statute warrant action by the commissioner and the superintendent arbitrarily changing the plain meaning of the agreement, in the absence of a clear showing that the agreement violated the statutory standards.
The use of the original proxies for "depreciation” and "other goods” has not been shown by the respondents to be in violation of the provisions of subdivision 3 of section 2807 of the Public Health Law which requires that payment for hospital service be "reasonably related to the costs of efficient production of such service.” On the contrary, as indicated, the use of actual costs effectively negates the intent of the Legislature when it changed the method of reimbursement from retrospective to prospective determination.
The contention that the use of the formulae set forth in the agreement would result in a "windfall” is inappropriate. Since we are not dealing with a retrospective determination of actual costs but rather with a prospective determination of reimbursement rates the fact that the hospitals may be paid at a higher rate is not controlling. The purpose of the statute is met if appropriate standards are applied so as to obtain the benefit of the cost incentive objective of the statute in fixing reimbursement rates, not to be changed when it turns out that the amount reimbursed may either be higher or lower than actual costs. Whatever the merits of the statute, which the court cannot consider, this is its purpose.
Perhaps this is another case in which so-called experts and aggressive administrators in and out of government and the concerned agencies have caused the substitution of a virtuous formula for hard solutions, incantation instead of inquiry. It is not within the court’s province to make such a judgment. However, it may be noted that whatever the approach and from whatever source, the cost of health care seems to rise steadily without noticeable increase in efficiency or level of care.
The commissioner and the superintendent were arbitrary and capricious in certifying and approving the revised 1974 *334 Blue Cross index and payment rates calculated by Blue Cross in plain violation of the agreement certified and approved by the commissioner and the superintendent.
Accordingly, the petitions are granted, the revised 1974 Blue Cross index and the 1974 payment rates calculated thereunder are annulled and the matter is remitted to the respondents for recalculation of the 1974 rates in a manner not inconsistent herewith.
Settle judgment including appropriate provisions for consolidation of the Albany County proceeding with the New York County proceeding and for transfer of the papers to New York County.