WILBUR FRIAR, on Behalf of Himself and All Other Persons Similarly Situated, Respondent, v VANGUARD HOLDING CORP., Appellant.

Second Department, December 15, 1980

APPEARANCES OF COUNSEL

*Sheppard Daniels* and *Suozzi, English, Cianciulli & Peirez, P. C. (J. Irwin Shapiro* and *Robert M. Calica* of counsel), for appellant.

*Russ, Weyl & Levitt (Jeffrey Levitt* of counsel), for respondent.

### OPINION OF THE COURT

LAZER, J.

This action is the legacy of events which occurred at a real estate title closing at which the seller unwillingly complied with the mortgage lender's demand that he pay a recently imposed mortgage recording tax. He now seeks recovery of the $61 paid over, punitive damages and certification of the suit as a class action on behalf of all sellers who were compelled or induced to pay the new mortgage tax by the same lender. The appeal is by the lender who seeks to reverse an order of Special Term which denied its motion to dismiss the complaint and which granted class action certification. The issues are significant.

## I

In October, 1978 the plaintiff contracted to sell his one-family home subject to the purchasers obtaining a mortgage loan commitment. The commitment subsequently was issued by the defendant Vanguard Holding Corporation (Vanguard), but during the interim between the execution of

the contract of sale and Vanguard's issuance of the commitment, the Legislature enacted section 253 (subd 1-a, par [a]) of the Tax Law (L 1978, ch 788, § 19, eff Jan. 1, 1979) which imposed a special additional mortgage recording tax of one quarter of 1% upon mortgage transactions. The statute provided that where the mortgaged premises contained six or less dwelling units, the lender was obliged to pay the tax and could not pass it on to the borrower "directly or indirectly."[1]

In disbursing the mortgage proceeds at the title closing held at its office, Vanguard charged the plaintiff with payment of the additional mortgage tax by deducting the sum of $122 from the amount payable to him. According to the plaintiff, Vanguard responded to his objections by representing that the provisions of the Tax Law required that the tax be paid by the seller. When plaintiff persisted in his refusal to accept the deduction, Vanguard refused to close the mortgage loan. With the buyers' belongings already in his house and the sale about to disintegrate, plaintiff agreed to pay half the tax, the real estate broker paid the balance.

Plaintiff then commenced this action asserting three causes of action. In the first, recovery of the $61 is sought on the ground that at the time plaintiff paid the money he was: "under economic duress tantamount to extortion and would have suffered considerable economic injury in an amount greater than the tax if the closing had not taken place, or would have been in the situation of litigation, the fees of which would have been greater than the tax, all of which was known by defendant."

The second cause of action avers that Vanguard's acts

1. "The tax imposed by this subdivision shall in cases of real property improved by a structure containing six residential dwelling units or less with separate cooking facilities be paid by the party making the loan secured by such mortgage, and such tax shall not be paid or payable, directly or indirectly by the borrower except as otherwise provided in sections two hundred fifty-eight and two hundred fifty-nine of this article. In all other cases, such tax shall be paid by the mortgagor except that the tax shall be paid by the mortgagee where the mortgagor is an exempt organization described in paragraph (b) of this subdivision. All of the provisions of this article shall apply with respect to the additional tax imposed by this subdivision to the same extent as if it were imposed by said subdivision one of this section, except as otherwise expressly provided in this article."

were willful and malicious and "were part of a far-flung scheme to defraud the public at large" for which punitive damages of $25,000 are demanded. In the third cause, plaintiff proposes that the action be brought on behalf of all persons who sold residential property within the meaning of subdivision 1-a of section 253 of the Tax Law where the closing took place after January 1, 1979 and Vanguard was the mortgage lender.

Upon receipt of the answer, plaintiff moved pursuant to CPLR 902 for class action certification and Vanguard countered with a cross motion, *inter alia*, to dismiss the complaint for failure to state a cause of action. Special Term denied the cross motion on the grounds that the allegations of economic duress and malice were sufficiently pleaded and granted class action certification. On this appeal, Vanguard contests the legal validity of plaintiff's claim for recovery of his $61, his right to plead a separate cause of action for punitive damages, and argues that the requisite class action criteria have not been met.

## II

In debating the merits of the first cause of action, the parties focus upon the doctrine of "economic duress" as expounded in *Austin Instrument v Loral Corp.* (29 NY 2d 124). Vanguard attacks the sufficiency of plaintiff's claim of "economic duress tantamount to extortion" by arguing that it is inapplicable here because no underlying contractual relationship existed between the parties as required by the pertinent authorities *(Austin Instrument v Loral Corp., supra; Bethlehem Steel Corp. v Solow*, 63 AD 2d 611; see, also, *Muller Constr. Co. v New York Tel. Co.*, 40 NY2d 955, 956; *Oleet v Pennsylvania Exch. Bank*, 285 App Div 411). Plaintiff confronts this contention by asserting that he was a third-party beneficiary of Vanguard's commitment to the purchasers and therefore in a contractual relationship with Vanguard. While plaintiff's theory of third-party beneficiary is palpably meritless, Vanguard's assertion that a claim of duress can only be made by parties in contractual privity is similarly flawed.

In *Austin Instrument (supra)*, Chief Judge FULD described economic duress or business compulsion as stem-

ming from a threat by a party to an agreement to breach it unless the other party complied with some further demand. The threat itself was insufficient to establish such duress, however, unless it also appeared "that the threatened party could not obtain the goods from another source of supply and that the ordinary remedy of an action for breach of contract would not be adequate" *(Austin Instrument v Loral Corp., supra,* pp 130-131). As Vanguard postulates, plaintiff has made "no showing of a prior contractual relationship or a showing that plaintiff had any obligation or duty to deal with [defendant]" (see *Bethlehem Steel Corp. v Solow, supra)* and it is apparent that his cause of action does not sound in economic duress or business compulsion as those terms are now used in this State.

Our inquiry is not thus concluded, however, unless we believe that the *Austin Instrument* formulation. has abolished the right to resort to common-law quasi-contractual or restitutive remedies to recover for duress or coercion. To find as Vanguard demands would be to violate the precept that redress may be sought for every substantial wrong (see *Battalla v State of New York,* 10 NY2d 237, 240; *Suffolk Housing Servs. v Town of Brookhaven,* 91 Misc 2d 80, 89, mod on other grounds 63 AD2d 731), for even if plaintiff could prove his claims he would be without legal recourse. The dispositive question is whether plaintiff's claim falls within a quasi-contractual mold.

The doctrine of quasi contract embraces a wide spectrum of legal actions resting "upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another * * * [I]t is not a contract or promise at all * * * [but] an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain * * * and which *ex aequo et bono* belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy" *(Miller v Schloss,* 218

NY 400, 407; see, generally, Keener, A Treatise on the Law of Quasi-Contracts [1893]; Woodward, The Law of Quasi-Contracts; Corbin, Quasi-Contractual Obligations, 21 Yale LJ 533).

Although restitutive remedies originally were not available in some areas of the law due to lack of precedent or perceived principle, abolition of the ancient forms of action freed the courts to apply such remedies (Perillo, Restitution in a Contractual Context, 73 Col L Rev 1208, 1222; see, also, Dobbs, Handbook on the Law of Remedies [1973], p 239). Quasi contract then became the vehicle through which the courts developed "a fairly detailed system of awarding restitution in cases where neither tort nor contract necessarily existed" (Dobbs, Handbook on the Law of Remedies, p 235).

The restitutory remedy applicable to the instant facts is an action for moneys had and received. Although originally an action for recovery of a debt, "it * * * gradually expanded as a medium for recovery upon every form of quasi-contractual obligation in which the duty to pay money is imposed by law, independently of contract, express or implied in fact * * * Its use to recover upon rights equitable in nature to avoid unjust enrichment by the defendant at the expense of the plaintiff, and its control in every case by equitable principles, established by Lord Mansfield in *Moses v Macferlan*[2] * * * have long been recognized" *(Stone v White*, 301 US 532, 534).

The broad flexibility of Lord Mansfield's formulation has long been recognized and followed in this State *(Bradkin v Leverton*, 26 NY2d 192; *Grombach Prods. v Waring*, 293 NY 609; *Miller v Schloss, supra; Echank v Schuchman*, 212 NY 352, 358; *Chapman v Forbes*, 123 NY 532, 536; *Schwinger v Hickok*, 53 NY 280, 286; *Eddy v Smith*, 13

---

2. The action for moneys had and received "lies for money paid by mistake, or upon a consideration which happens to fail, or for money got through imposition, (express, or implied,) or extortion, or oppression, or an undue advantage taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances * * * [T]he gist of this kind of action is that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." *(Moses v Macferlan*, 2 Burr 1005, 1012, 1 Wm Bl 219, 97 Eng Rep 676 [MANSFIELD, J.])

Wend 488; *Forest-Fehlhaber v State of New York,* 74 AD 2d 272, 275; *Town of Bleecker v Balje,* 138 App Div 706; *Seeber v People's Bldg. Loan & Sav. Assn.,* 36 App Div 312; *Nacional Financiera, S.A. v Banco de Ponce,* 120 NYS2d 373, affd 283 App Div 939).

Although the remedy is one at law, actions for moneys had and received are based upon equitable principles (*Federal Ins. Co. v Groveland State Bank,* 37 NY2d 252, 258; *Schank v Schuchman, supra,* p 358), but they are only available where the defendant received money or its equivalent *(National Trust Co., of City of N.Y. v Gleason,* 77 NY 400, 403; *Brundage v Village of Port Chester,* 102 NY 494, 499). No privity of contract is required in an action for moneys had and received except that which results from the circumstances of the case *(Pease v Egan,* 131 NY 262, 272; *Roberts v Ely,* 113 NY 128, 131) and whether defendant's original possession of the money was rightful or wrongful is immaterial *(Roberts v Ely, supra,* p 131; *Hoyt v Wright,* 237 App Div 124; see, also, Corbin, Waiver of Tort and Suit in Assumpsit, 19 Yale LJ 221, 231).

While at first blush the doctrine of "economic duress" enunciated in *Austin Instrument* (29 NY2d 124, *supra)* would seem to constrict common-law restitutive remedies by imposing a requirement for contractual privity of some sort, its actual effect is to the contrary. *Austin Instrument* is consistent with restitutory principles in expanding the rights of persons contractually bound to each other to recover damages not ordinarily available under traditional breach of contract criteria. It thus permits those who have yielded to threatening or extortionate demands for further consideration for the performance of a previously made promise to recover the coerced payments if the circumstances indicate that the victimized party had no choice but to accede and the misconduct was not merely "hard bargaining" (see *Hugo v Lowei, Inc. v Kips Bay Brewing Co.,* 63 NYS2d 289, 290). *Austin Instrument* does not abolish other restitutory remedies available to those who do not stand in a contractual relationship with each other.

Read liberally in the light of these principles, plaintiff's first cause of action does make out a claim for moneys had and received. Faced with Vanguard's threat to abort the

closing unless he succumbed to the demand for money, plaintiff's only alternative was to stand on his contractual right to demand the balance of the contract price from the purchasers. Since they were borrowing the requisite funds from Vanguard, however, the demand could accomplish little else than the collapse of the sale. Unless the plaintiff was willing to accept a cause of action against the purchasers as a substitute for the cash consideration due him under the contract, there was no realistic alternative to surrender to Vanguard's demands. Thus the first cause of action to compel Vanguard to disgorge the payment may stand.

■ Plaintiff's second cause, however, must be dismissed with leave to amend the prayer for relief. A claim for punitive damages, standing alone, does not properly constitute a separate cause of action (see, e.g., *Schwed v Turoff*, 73 AD2d 615; *Knibbs v Wagner*, 14 AD2d 987; *Gill v Montgomery Ward & Co.*, 284 App Div 36).

### III

Finally, there is the issue of class action certification. The order granting that relief defines the class as composed of "all sellers of property * * * [who were] charged and did pay the tax to defendant at the closing as a result of mistake, misrepresentation, economic duress or other reason". It is apparent that the phrase "or other reason" should be deleted since its broad sweep would subvert the rationale of a class action grounded on the theory of moneys had and received. The rationale of the class claims against Vanguard must be that "it is against good conscience for [it] to keep the money" (see *Federal Ins. Co. v Groveland State Bank*, 37 NY2d 252, 258, *supra*).

■ We disagree, however, with the view expressed by our dissenting colleague that class action status was erroneously granted because some of the criteria of CPLR 901 (subd a) for such status went unmet. CPLR 901 (subd a) authorizes a class action if: (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class predominate over any question affecting only individual members;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the representative parties will fairly and adequately protect the interests of the class; and (5) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. These criteria should be broadly construed not only because of the general command for liberal construction of all CPLR sections (see CPLR 104), but also because it is apparent that the Legislature intended article 9 to be a liberal substitute for the narrow class action legislation which preceded it (see *Ray v Marine Midland Grace Trust Co.*, 35 NY2d 147; *Moore v Metropolitan Life Ins. Co.*, 33 NY2d 304, 313; Twentieth Ann Report of NY Judicial Conference, 1975, pp 206-207; Memorandum of Governor Carey, NY Legis Ann, 1975, p 426). Under earlier laws (CPLR former 1005; former Civ Prac Act, § 195; former Code Civ Pro, § 448; First Report of Commissioners on Practice and Pleadings, Code of Procedure [Field Code], 1848, § 119), class actions were viewed as requiring a sort of unity among class members bordering on the nebulous concepts of "privity" or "joint tenancy" (see, e.g., Homburger, Private Suits in the Public Interest in the United States of America, 23 Buffalo L Rev 343, 353; *Lichtyger v Franchard Corp.*, 18 NY2d 528; *Society Milion Athena v National Bank of Greece*, 281 NY 282; *Guffanti v National Sur. Co.*, 196 NY 452; *Greer v Smith*, 155 App Div 420).

Article 9 was enacted to "infuse the pertinent law with a measure of practical flexibility and to accommodate pressing needs for an effective yet 'balanced group remedy in vital areas of social concern'" (see The Survey of New York Practice, Article 9—Class Actions, 50 St John's L Rev 189, 190, quoting with approval the memorandum of Assemblyman Stanley Fink in support of NY Senate Bill No. 1309-B, NY Assembly Bill No. 1252-B, at p 1, 198th Session [1975]; see, also, Twelfth Ann Report of NY Judicial Conference to the Legislature on the CPLR, Twentieth Ann Report of NY Judicial Conference, 1975, pp 204-211). Nevertheless, despite that much heralded flexibility and the functional terms contained in the article (see McLaughlin, An Overview, McKinney's Cons Laws of

NY, Book 7B, CPLR art 9, p 319; Siegel, New York Practice, § 141, p 178; The Survey of New York Practice, Article 9—Class Actions, 50 St John's L Rev 189), its effect in broadening the application of the remedy has been modest indeed.[3]

The relatively minor results flowing from article 9 have been viewed by commentators as resulting from judicial failure to give the statute its intended effect (Class Actions in New York: Recovery for Personal Injury in Mass Tort Cases, 30 Syr L Rev 1187, 1209) and from the "cautious if not hostile" approach to the article (Siegel, New York Practice, 1979-1980 Pocket Part, p 29). Our own research reveals that class action status has been denied in 75% of the reported cases construing article 9 since its enactment in 1975.[4] While this statistic may well reflect the merits of

3. In the five years since the enactment of article 9, class action status was granted in the following 12 reported cases: *King v Club Med*, 76 AD2d 123; *Felder v Foster*, 71 AD2d 71, app dsmd 49 NY2d 800; *Ammon v Suffolk County*, 67 AD2d 959; *Beekman v City of New York*, 65 AD2d 317; *Matter of Eisenstark v Anker*, 64 AD2d 924; *Doe v Greco*, 62 AD2d 498; *Vickers v Home Fed. Sav. & Loan Assn. of East Rochester*, 56 AD2d 62; *Matter of Knapp v Michaux*, 55 AD2d 1025; *Gilman v Merrill Lynch, Pierce, Fenner & Smith*, 93 Misc 2d 941; *Cooper v Morin*, 91 Misc 2d 302, appealed on other grounds and mod *sub nom. Cooper v Lombard*, 64 AD2d 130, appealed on other grounds and mod 49 NY2d 69; *Guadagno v Diamond Tours & Travel*, 89 Misc 2d 697; *Boulevard Gardens Tenants Action Committee v Boulevard Gardens Housing Corp.*, 88 Misc 2d 98; see, also, *Cannon v Equitable Life Assur. Soc. of U. S.*, 106 Misc 2d 1060.

4. Class action status was denied in the following cases: *Svendsen v Smith's Moving & Trucking Co.*, 76 AD2d 504; *Bloom v Cunard Line*, 76 AD2d 237; *Simon v Cunard Line*, 75 AD2d 283; *Matter of Fairly v Fahey*, 75 AD2d 158; *Klakis v Nationwide Leisure Corp.*, 73 AD2d 521; *Matter of Froehlich v Toia*, 71 AD2d 824; *Goldman v Garofalo*, 71 AD2d 650; *Selden Sanitary Corp. v Elstroth*, 69 AD2d 402; *Suffolk Housing Servs. v Town of Brookhaven*, 69 AD2d 242, app dsmd 49 NY2d 799; *Tanzer v Turbodyne Corp.*, 68 AD2d 614; *Wojciechowski v Republic Steel Corp.*, 67 AD2d 830, mot for lv to app dsmd 47 NY2d 707; *Community Serv. Soc. v Welfare Inspector Gen. of State of N.Y.*, 91 Misc 2d 383, affd without opn 65 AD2d 734; *Rosenfeld v Robins Co.*, 63 AD2d 11, app dsmd 46 NY2d 731; *Strauss v Long Is. Sports*, 60 AD2d 501; *Gould v American Health & Life Ins. Co. of N.Y.*, 59 AD2d 681; *National Bank of Westchester v Pisani*, 58 AD2d 597; *Matter of Gruen v Parking Violations Bur. of City of N.Y.*, 58 AD2d 48; *Ross v Amrep Corp.*, 57 AD2d 99, app dsmd 42 NY2d 910; *New York State Deputies' Assn. v New York State Civ. Serv. Comm.*, 57 AD2d 550; *Sharrock v Dell Buick-Cadillac*, 56 AD2d 446, appealed on other grounds and affd 45 NY2d 152; *Jennings v Domestic Fin. Corp.*, 55 AD2 832; *Matter of Barton v Lavine*, 54 AD2d 350; *Brito v Ross*, 53 AD2d 414, revd on other grounds 43 NY2d 229; *Matter of Shook v Lavine*, 49 AD2d 238; *Snyder v Hooker Chems. & Plastics Corp.*, 104 Misc 2d 735; *Matter of*

some of the actions brought rather than restrictive judicial outlook, analysis of the cases indicates a continuing tendency toward narrow construction of the statute. The Court of Appeals has not yet revealed its own attitude on the subject.

Since CPLR article 9 is modeled upon rule 23 of the Federal Rules of Civil Procedure (in US Code, tit 18, Appendix) (see *O'Hara v Del Bello*, 47 NY2d 363, 368; Siegel, New York Practice, p 178) and essentially adopts the broad prerequisites of a rule 23 (subd [b], par [3]) action as its criteria for all class actions (see McLaughlin, An Overview, McKinney's Cons Laws of NY, Book 7B, CPLR art 9, p 319; The Survey of New York Practice, Article 9— Class Actions, 50 St Johns L Rev 189, 193), the difference in approach between the Federal judiciary and our own is indisputably sharp (compare, e.g., *Matter of Robins Co. "Dalkon Shield" IUD Prods. Liab. Litigation*, 406 F Supp 540, with *Rosenfeld v Robins Co.*, 63 AD2d 11, app dsmd 46 NY2d 731).

The policy of rule 23 is to favor the maintenance of class actions and liberal interpretation *(King v Kansas City So. Inds.*, 519 F2d 20, 25-26; *Lewis v Capital Mtge. Invs.*, 78 FRD 295; *Alameda Oil Co. v Ideal Basic Inds.*, 326 F Supp 98). That policy is especially strong in instances where denial of class action status would effectively terminate further litigation *(Helfand v Cenco, Inc.*, 80 FRD 1, 5;

*Marthen v Evans*, 104 Misc 2d 553; *Federation of N.Y. State Rifle & Pistol Clubs v McGuire*, 101 Misc 2d 104; *Matter of Mervak v City of Niagara Falls*, 101 Misc 2d 68; *Cornell Univ. v Dickerson*, 100 Misc 2d 198; *Sinhogar v Parry*, 98 Misc 2d 28, appealed on other grounds and mod 74 AD2d 204; *Petrosino Seafood Corp. v Consolidated Edison Co. of N.Y.*, 97 Misc 2d 110; *Russo & Dubin v Allied Maintenance Corp.*, 95 Misc 2d 344; *Compact Electra Corp. v Paul*, 93 Misc 2d 807; *Wasserbauer v Marine Midland Bank-Rochester*, 92 Misc 2d 388; *Viders v Pennsylvania Handicapped Workers*, 90 Misc 2d 579; *Bruno v Codd*, 90 Misc 2d 1047, revd on other grounds 64 AD2d 582, affd 47 NY2d 582; *Matter of Mennella v Mills*, 89 Misc 2d 1002; *Flushing Nat. Bank v Municipal Assistance Corp. for City of N.Y.*, 89 Misc 2d 342; *Mykolin v Consolidated Edison Co. of N.Y.*, 89 Misc 2d 193; *Tucker v Toia*, 89 Misc 2d 116, appealed on other grounds and affd 43 NY2d 1; *Perez v Dumpson*, 88 Misc 2d 506, mod on other grounds 58 AD2d 887; *Matter of Beekman-Downtown Hosp. v Whelan*, 88 Misc 2d 324, revd on other grounds 57 AD2d 1, revd on other grounds 44 NY2d 124; *Kanon v Brookdale Hosp. Med. Center*, 87 Misc 2d 816; *Peterson v Berger*, 84 Misc 2d 517; *Lombard v Staszak*, 83 Misc 2d 1050.

*King v Kansas City So. Inds., supra;* cf. *Zahn v International Paper Co.,* 469 F2d 1033, 1035, affd 414 US 291), even to the extent that a class should be permitted to go forward if it "would clear up a goodly proportion of what appears to be the overall dispute" (Landers, of Legalized Blackmail and Legalized Theft: Consumer Class Actions and the Substance-Procedure Dilemma, 47 S Cal L Rev 842, 862; see, e.g., *Kemp v Birmingham News Co.,* 608 F2d 1049; *Green v Wolf Corp.,* 406 F2d 291, cert den 395 US 977; *Dubose v Harris,* 434 F Supp 227; *Lamb v United Security Life Co.,* 59 FRD 25; *Rockler & Co. v Graphic Enterprises,* 52 FRD 335). The rationale for the expansive Federal attitude lies in two distinct theories—"therapeutic benefits" (McCall, Due Process and Consumer Protection: Concepts and Realities in Procedure and Substance-Class Action Issues, 25 Hastings LJ 1351; Hornstein, Legal Therapeutics: The "Salvage" Factor in Counsel Fee Awards, 69 Harv L Rev 658, 662-663; see, e.g., *Esplin v Hirschi,* 402 F2d 94, 101, cert den 394 US 928; *Green v Wolf Corp., supra,* p 299; *Berland v Mack,* 48 FRD 121, 125; *Dolgow v Anderson,* 43 FRD 472, 485-488) and due process (see *Boddie v Connecticut,* 401 US 371). Therapeutic benefits are premised on the concept of collateral public benefits flowing from use of the remedy. The class action is seen as a means of inducing socially and ethically responsible behavior on the part of large and wealthy institutions which will be deterred from carrying out policies or engaging in activities harmful to large numbers of individuals. Absent the class action lawsuit, the theory goes, these institutions will be permitted to operate virtually unchecked and continue to engage in "legalized theft" which is perpetuated because the injured potential plaintiffs frequently are damaged in a small sum (often less than $100) since, realistically speaking, our legal system inhibits the bringing of suits based upon small claims *(Escott v Barchris Constr. Corp.,* 340 F2d 731; *Weeks v Bareco Oil Co.,* 125 F2d 84, 88-90; *Matter of Antibiotic Antitrust Actions,* 333 F Supp 267, 278, 282-283).

The due process view is founded on the notion that the class action mechanism affords many individuals a quasi-constitutional right to litigate—to participate meaningfully

in the legal process—which they otherwise would not have. As the Supreme Court has noted: "Rule 23 of the Federal Rules of Civil Procedure provides for class actions that may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *(Hawaii v Standard Oil Co.,* 405 US 251, 266.) By construing the availability of class action relief narrowly, the judiciary is seen as denying access to the courts to thousands of individuals whose minimal damages are greatly outweighed by the prohibitive costs involved in prosecuting a lawsuit against a wealthy opponent (see, e.g., *Welmaker v Grant Co.,* 365 F Supp 531; *Steinmetz v Bache & Co.,* 71 FRD 202; *Kesler v Hynes & Howes Real Estate,* 66 FRD 43; see, also, Memorandum of Governor Carey, NY Legis Ann, 1975, p 426).

Whether New York's restrictive attitude toward class actions derives from the difficulty in accommodating the structure of the State judicial system to the activist role required for the conduct of class actions is not clear. Although the class action Trial Judge has been described as "manager" of the case *(Matter of Nissan Motor Corp. Antitrust Litigation,* 552 F2d 1088, 1102; *Matter of Air Crash Disaster at Fla. Everglades on Dec. 29, 1972,* 549 F2d 1006; see, generally, 7A Wright & Miller, Federal Practice and Procedure, § 1791, p 193; Fed Rules Civ Pro, rule 23, subds [c], [d], [e]), the wide discretion granted by rule 23 in conducting and moving forward the suit is not as clearly duplicated in article 9. Whatever the reason, however, it is apparent that the State's palpable tilt away from broad use of the remedy has been significantly influenced by narrow interpretations of article 9 (see, e.g., *Suffolk Housing Servs. v Town of Brookhaven,* 69 AD2d 242, app dsmd 49 NY2d 799; *Rosenfeld v Robins Co.,* 63 AD2d 11, app dsmd 46 NY 2d 731, *supra; Wasserbauer v Marine Midland Bank-Rochester,* 92 Misc 2d 388). We believe that there is a strong grain of soundness in Professor Siegel's observation that "the class action's future depends on the attitude of the judges. The factors which must be considered before determining whether to permit an action in class form are so flexible that equally reasonable minds can flex them either

way" (Siegel, New York Practice, 1979-1980 Pocket Part, p 29).

## IV

It is with these considerations in mind that analysis of the specific criteria of CPLR 901 (subd a) applicable to this case must be undertaken. There is no "mechanical test" to determine whether the first requirement—numerosity—has been met *(Kelley v Norfolk & Western Ry. Co.*, 584 F2d 34, 35), nor is there a set rule for the number of prospective class members which must exist before a class is certified *(Cypress v Newport News Gen. & Nonsectarian Hosp. Assn.*, 375 F2d 648). Each case depends upon the particular circumstances surrounding the proposed class *(Chmieleski v City Prods. Corp.*, 71 FRD 118) and the court should consider the reasonable inferences and commonsense assumptions from the facts before it *(Gay v Waiters' & Dairy Lunchmen's Union*, 549 F2d 1330; *Brady v LAC, Inc.*, 72 FRD 22; *Hawk Inds. v Bausch & Lomb*, 59 FRD 619; see, also, *Westcott v Califano*, 460 F Supp 737, affd 443 US 76).

Here the plaintiff alleges the existence of a class of at least 300 sellers, the purchase of whose properties was financed by Vanguard. While not disputing this number, the defendant admits that the additional mortgage tax was "passed on" to sellers or brokers as part of its business policy. Where allegations of a prospective class of 300 or more are not specifically challenged by a defendant despite the fact that information as to the size of the class is within the defendant's control, the numerosity requirement is satisfied (see *Mills v Roanoke Ind. Loan & Thrift*, 70 FRD 448, 452).

The predominance requirement—that "questions of law or fact common to the class * * * predominate over any questions affecting only individual members" (CPLR 901, subd a, par 2)—unquestionably is the most troublesome one in the section and the dissenter eloquently reasons that predominance has not been established here. Considering the dearth of New York case law interpreting the requirement, Federal jurisprudence is helpful (see Siegel, New York Practice, p 178). In the Federal system, the "predomi-

nance" inquiry has led to widely differing and irreconcilable results (see Miller, An Overview of Federal Class Actions: Past, Present and Future, 4 Justice System J 197, 211 ["A DiVinci or Michaelangelo could not draw a straight line through the subdivision (b) (3) cases"]) because of the practice of focusing upon the delineation of all questions as either "common" or "individual" and then deciding which group outweighs the other. Discrete weighing has evoked criticism from those who suggest that the focus of the predomination inquiry should be that of promoting efficient economy of judicial resources (see *Green v Wolk Corp.*, 406 F2d 291, *supra; Esplin v Hirschi*, 402 F2d 94, *supra; State of Minnesota v United States Steel Corp.*, 44 FRD 559; Miller, An Overview of Federal Class Actions: Past, Present and Future, 4 Justice System J 197, 212, ["maximum bang for the judicial buck"]). We, too, abjure the weighing process in the belief that the decision as to whether there are common predominating questions of fact or law so as to support a class action should not be determined by any mechanical test, but rather, "whether the use of a class action would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated' " *(LaMar v H & B Novelty & Loan Co.,* 55 FRD 22, 25; Advisory Committee Notes, 39 FRD 73, 103; see, also, *Hernandez v Motor Vessel Skyward,* 61 FRD 558, affd 507 F2d 1278; cf. *Buford v American Fin. Co.,* 333 F Supp 1243).

The gravamen of the instant class action claim against Vanguard is its allegedly wrongful imposition upon sellers of its own obligation to pay the additional mortgage recording tax despite the Legislature's declaration that the tax was to be paid by the lender (see Tax Law, § 253, subd 1-a, par [a]). Vanguard has admitted that this practice was part of its business policy despite the fact that the Attorney-General had informed it that the practice was "an unwarranted attempt to circumvent the clear statutory directive".

As we have earlier observed, the offer from Vanguard realistically broached no refusal. Either plaintiff paid the mortgage tax that the law obligated Vanguard to pay or the title closing would be terminated without the seller re-

ceiving the sums due from the sale, leaving him with the prospect of suing the purchasers (and Vanguard, if he could construct a cognizable theory). While plaintiff's situation was specially dramatic because the purchasers' belongings already had been moved into his house, the scenario is not unfamiliar. When residential property closes, the seller generally requires the proceeds to close on other premises and either has already moved or is about to do so. The buyer's position is similar. Such circumstances demonstrate the fallacy of any contention that each seller who may have succumbed to Vanguard's pressure or blandishments did so after engaging in a contest of wills which would require a separate trial for each claim. In the absence of misrepresentation by the defendant or mistake by the seller, each of which might constitute a basis for the recovery of the money paid over (see *Miller* v *Schloss*, 218 NY 400, 408, *supra;* cf. CPLR 3005; 13 Williston, Contracts [3d ed], § 1574), it is almost impossible to envisage circumstances in which a seller would willingly confer a financial gratuity upon the buyer's lender. Nor do we agree with our dissenting colleague that a lawyer's mistake in permitting his client to pay the tax necessarily relieves the defendant of the obligation to make restitution for the tax wrongfully charged the client, for even "plaintiff's carelessness in paying the money to defendant, appellant, does not stand in the way of his recovery of money paid by mistake to one who had no right to retain it" *(Nusbaum v Rialto Security Corp.,* 238 App Div 257, 258; see, also, *Gibbons v Perkins,* 132 Misc 583).

The paramount issue, then, is the propriety of Vanguard's conduct at the closing. The fact that there may have been differences in the manner in which Vanguard exacted money from sellers at each closing does not mean that individual questions predominate: the rule requires predominance, not identity or unanimity, among class members *(Cohen v Uniroyal, Inc.,* 77 FRD 685). Similarly, the fact that questions peculiar to each individual may remain after resolution of the common questions is not fatal to the class action *(Matter of Caesars Palace Securities Litigation,* 360 F Supp 366). The entire matter of liability can be easily disposed of once it is determined how Vanguard passed the tax on and why. To litigate this issue 300 times

would be an obvious waste of judicial resources; to deprive a potential group of 300 litigants of a practical means to recover would frustrate the intent of the statute by continuing its constrictive interpretation.

The remaining criteria are somewhat more easily disposed of. As to typicality (CPLR 901, subd a, par 3), plaintiff's claim derives from the same practice or course of conduct that gave rise to the remaining claims of other class members and is based upon the same legal theory; therefore, that requirement is satisfied (see *Morgan v Laborers Pension Trust Fund for Northern Cal.*, 81 FRD 669). Since adequacy of representation of the class interests by plaintiff (see CPLR 901, subd a, par 4) is not in issue, there remains the superiority requirement—whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy" (see CPLR 901, subd a, par 5). Our dissenting collleague declares that since no other aggrieved sellers are " 'already in existence' " it is neither fair nor efficient to permit the action to proceed as a class action. It is just as likely that failure to come forward "means only that there is a general lack of knowledge of the lawsuit, that others lack the resources to initiate communication in this regard, or that other members of the class, knowing of this suit, do not object to plaintiffs' representation" *(Lamb v United Security Life Co.*, 59 FRD 25, 32, *supra)*. The superiority requirement is identical with its counterpart in rule 23 (subd [b], par [3]) of the Federal Rules of Civil Procedure and has been interpreted as requiring the court to examine other adjudicative possibilities and compare them to the class action (see, e.g., *Katz v Carte Blanche Corp.*, 496 F2d 747, cert den 419 US 885; *Kaufman v Lawrence*, 76 FRD 397; cf. *Alpert v United States Inds.*, 59 FRD 491; *Shields v Valley Nat. Bank of Ariz.* 56 FRD 448; see, also, *Matter of Antibiotic Antitrust Actions*, *supra)*. This form of analysis "misses the mark in terms of what the draftsmen meant by superiority, particularly their clear intention that the class action be available to assist small claimants in securing redress of their grievances" (Miller, An Overview of Federal Class Actions: Past, Present and Future, 4 Justice System J 197, 213). The need for a pragmatic approach to the question of superi-

ority has been cogently set out in Professor Siegel's classic work: "Any device which would allow one action to do a job, or a good part of it, that would otherwise have to be done by many, must be considered 'superior' in a state which is as pro-consolidation as New York is: were all the potential class members to bring separate actions, the common issue would itself permit consolidation of all of them and the courts would be almost certain to grant it. This is not to say that class status is permissible whenever, were each class member to bring separate suit, consolidation could ensue. It is only to stress that as far as CPLR 901(a) (5) is concerned, New York does deem one action a 'superior' way to adjudicate multiple claims. To that extent the analogy is compelling." (Siegel, New York Practice, § 141, p 180; see, also, 30 Syr L Rev 1187, 1206-1207).

■ Although we thus conclude that Special Term was correct in granting class action status, we observe that one of the strengths of CPLR article 9 is its flexibility. A decision granting class action status is not immutable and if later events indicate that the decision should be reversed, altered or amended, requisite relief is authorized. The Trial Judge has discretion to sever certain issues for class determination (CPLR 906, subd 1), to divide the class into subclasses (CPLR 906, subd 2), to decertify the class (CPLR 902) and to make any appropriate order dealing with procedural matters concerning the conduct of the litigation (CPLR 907, subd 6). In view of the purposes to be served by the class action device and the ability to reverse or revise the status, we agree that "the interests of justice require that in a doubtful case * * * any error, if there is to be one, should be committed in favor of allowing the class action" (*Esplin v Hirschi*, 402 F2d 94, 101, *supra*).

Accordingly, the order must be modified to the extent set forth and otherwise affirmed.

MARGETT, J. (concurring in part and dissenting in part). While I am in accord with the conclusion of the majority in all other respects, I cannot agree that the prerequisites of CPLR 901 (subd a) have been met on the record of this case. Accordingly, I vote to modify the order appealed from not only to the extent directed by the majority, but also by

further deleting so much of that order as authorizes plaintiff to maintain this action as a class action. As so modified, the order should be affirmed.

Assuming, *arguendo*, that a class action is otherwise appropriate here, the definition of the class approved by the court is so broad that the claim of the plaintiff is not "typical of the claims * * * of the class", a prerequisite to the maintenance of a class action under CPLR 901 (subd a, par 3). The order of Special Term defines the class as comprised of: "all sellers of property, subsequent to January 1, 1979, who attended at a closing pursuant to a mortgage commitment issued by defendant, wherein the seller sold real property containing six residential units or less, containing separate cooking facilities, wherein the seller had not contracted to pay the tax required by Tax Law Section 253, Subdivision 1-a, effective January 1, 1979, but was charged and did pay the tax to defendant at the closing as a result of mistake, misrepresentation, economic duress or other reason". The complaint and motion papers establish that plaintiff's claim is that he effectively paid a portion of the tax in question as a result of "economic duress", not "mistake, misrepresentation" or any "other reason". There is not a single allegation in the record that plaintiff paid the tax as a result of mistake or any "other reason". Although the complaint does contain a reference to an obvious misrepresentation by defendant as to the requirements of the statute in question, it also states that, after the misrepresentation was made, plaintiff "still refused to pay" the tax, and paid a portion thereof only after defendant refused to close the loan until the tax was paid. I note further that, even if there was a legally sufficient causal relation between defendant's alleged misrepresentation and plaintiff's having paid the tax, it appears that plaintiff, like most other sellers of real property, was represented at the closing by an attorney. Thus, the truth or falsity of defendant's representation could have been easily ascertained by plaintiff and he could not have reasonably relied on the alleged misrepresentation of defendant. (See *Cudemo v Al & Lou Constr. Co.*, 54 AD2d 995.) In short, plaintiff's claim is not based on mistake or any "other reason" and cannot be based on misrepresenta-

tion. Accordingly, that claim is not typical of the claims of those members of the purported class whose claims rest on their having paid the tax "as a result of mistake, misrepresentation *. * * or other reason".

Concededly, plaintiff's claim is typical of persons who paid the tax as a result of their having been subjected to "economic duress" of a degree and nature sufficient to be actionable in an action for moneys had and received. However, the nature of such a claim and the defenses which can be asserted against it are likely to engender "questions affecting only individual members" of the class of such magnitude that they are not subordinate to "questions of law or fact common to the class" as required by CPLR 901 (subd a, par 2). To establish their claims of "economic duress" class members will be required to show that they were forced to pay the tax "by means of a wrongful threat precluding the exercise of [their] free will" (see *Austin Instrument v Loral Corp.*, 29 NY2d 124, 130). This will require an examination of the particular facts and circumstances of each member of the class, including the state of mind of each of them. Characterization of this action as one for moneys had and received also portends the necessary resolution of numerous and substantial individual questions. Such an action is "founded upon equitable principles aimed at achieving justice, unimpeded by legal niceties" *(Federal Ins. Co. v Groveland State Bank,* 37 NY2d 252, 258). It is also (p 258) " 'the most favorable way in which a defendant can be sued' " in that " ' "he may defend himself by everything which shows the plaintiff *ex aequo et bono* is not entitled to the whole of his demand or any part of it" ' ". In view of the nature of such an action and the breadth of the defense available against it, it is my view that individual, rather than common questions, will predominate in this case.

Consequently, I perceive no advantage to be gained from permitting the action to proceed as a class action since the proceeding is very likely to " 'splinter into individual trials' " (see *Strauss v Long Is. Sports,* 60 AD2d 501, 507).

Finally, in my view, there has not been a sufficient demonstration that "a class action is superior to other avail-

able methods for the fair and efficient adjudication of the controversy", as required by CPLR 901 (subd a, par 5). Plaintiff's representative claim is one of economic duress, the underlying facts of which should now be well known to any potential claimants, rather than one based on mistake or misrepresentation, the underlying facts of which, by their nature, may not yet be necessarily apparent. Accordingly, the absence in the record of any suggestion, other than plaintiff's attorney's unsupported assertion, that there are any other persons who regard themselves as aggrevied by defendant's actions is a strong indication that it is neither "fair" nor "efficient" to permit this action to proceed as a class action. As we have stated: " 'If a class of interested litigants is not already in existence the court should not go out of its way to create one without good reason' *(Berley v Dreyfus & Co.*, 43 FRD 397, 398-399)" *(Strauss v Long Is. Sports, supra,* p 511). Admittedly, there may be persons other than plaintiff who perceive themselves to be aggrieved by actions of the defendant in the nature of the infliction of economic duress. However, where, as here, the likelihood of the existence of a class of such persons is not apparent from the nature of the alleged wrong, a class action, with its attendant complexities, should not proceed in the face of a record devoid of any suggestion of the existence of such persons. Accordingly, my other objections aside, I would not permit this action to proceed as a class action until plaintiff has established, by discovery or proper investigation, facts which tend to show he is not alone in his complaint of economic duress against defendant. (See *Gottlieb v March Shipping Passenger Servs., Div. of March Shipping Corp.,* 67 AD2d 879.)

HOPKINS, J.P., and O'CONNOR, J., concur with LAZER, J.; MARGETT, J., concurs in part and dissents in part, in an opinion.

Order of the Supreme Court, Nassau County, dated October 24, 1979, modified, on the law, (1) by deleting from the third decretal paragraph thereof the words "or other reason" and (2) by adding to the eleventh decretal paragraph thereof, immediately after the provision denying defendant's cross motion, the following: "except that the second cause of action, seeking punitive damages, is dis-

missed." As so modified, order affirmed, with $50 costs and disbursements to plaintiff. Plaintiff is granted leave to amend his prayer for relief in accordance with the opinion herein within 20 days after service upon him of a copy of the order to be made hereon, together with notice of entry thereof.