NO. 07-01-0328-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



JUNE 7, 2002


______________________________



TRI-STATE CHEMICALS, INC.
,




 Appellant


v.



WESTERN ORGANICS, INC., 




 Appellee

_________________________________



FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;



NO. 88,953-B; HON. JOHN B. BOARD, PRESIDING


_______________________________



Before BOYD, C.J., QUINN and REAVIS, J.J.

 Tri-State Chemicals, Inc. (Tri-State) appeals from a final summary judgment denying
it recovery against Western Organics, Inc. (Western). The latter had filed a traditional and
"no evidence" motion for summary judgment. On appeal, the two issues raised by Tri-State
involve whether the trial court erred in granting the motion. That is, Tri-State asserts that
Western failed to establish its right to judgment as a matter of law since the record
contained some evidence creating material issues of fact on each issue broached by
Western. We reverse and remand. 

Standard of Review


 The standards of review applicable to traditional and no evidence motions for
summary judgment are well-settled. We cite the parties to Nixon v. Mr. Property
Management Co., 690 S.W.2d 546, 548 (Tex. 1985) and Kimber v. Sideris, 8 S.W.3d 672,
675 (Tex. App.--Amarillo 1999, no pet.) for a general explanation of them. 

Background


 The foregoing standards of review require us to construe the evidence of record in
a light most favorable to the party opposing summary judgment, i.e. Tri-State. See Kimber
v. Sideris, 8 S.W.3d at 675-76. Doing so, we find evidence that illustrates the following.

 On August 1, 1996, Tri-State and Panhandle Agri Tech, Inc. (Panhandle), through
its president, Rodney Burd (Burd), entered into a written contract. Pursuant to it, Tri-State
agreed to deliver products to Panhandle on consignment, and Panhandle agreed to use
its best efforts to promote their sale to customers approved of by Tri-State. Within the
contract were the following provisions:

 2. Consignment


 . . . 'Consignment' shall have the meaning and application assigned to it by
the Uniform Commercial Code as adopted in the state of Texas, and
Consignee [Panhandle] acknowledges that it does not take title to the
Products, but merely holds such Products for sale on behalf of Tri-State;




 
 Services and Responsibilities 

 


 . . . A. Consignee agrees to use its best efforts to promote sales, to solicit
orders, and to apply Products when necessary, on behalf of Tri-State, to
approved accounts of Tri-State . . . .



 4. Payment for Products

 

 Billing for Products is to be performed by Tri-State; however, all payments
received by Consignee [Panhandle] upon delivery of Tri-State Products or
payments received on accounts, shall be and remain absolute property of
Tri-State and shall be kept separate and apart from the property and account
of Consignee [Panhandle]. All payments for Tri-State Products shall be
remitted directly to Tri-State. 


 6. Security Filing and Notice


 A. Tri-State may request , and Consignee [Panhandle] agrees to comply
fulling with such request, a UCC Article 9 filing on all Tri-States's Products
placed in Consignee's facilities in order to notify Consignee's creditors or
other interested persons that Tri-State owns and has title to the Products at
Consignee's warehouse. Consignee [Panhandle] further agrees to place a
sign or signs in a conspicuous position near the Products that states: 

 'THESE PRODUCTS ARE THE SOLE PROPERTY OF TRI-STATE.' 
Consignee agrees to execute a security agreement and form UCC - 1 as
appropriate . . . covering all consigned Products and for Products delivered
to Consignee but for which payment has not been made. Consignee
[Panhandle] expressly covenants to maintain the Products free and clear of
any and all liens and encumbrances, to segregate the Products in its storage
facilities, and to designate the Products as being owned by Tri-State.


 B. Consignee [Panhandle] agree and acknowledges that no creditor of
Consignee shall have any right to or interest in the Products or the proceeds
thereof. 

(Emphasis added). 

 After Tri-State began delivering its products to Panhandle, Burd deposited
receivables and proceeds from the sale of the consigned goods into a general operating
account of Panhandle. That account also contained funds generated from sources other
than the sale of Tri-State products. Monies were then taken from the account to buy
various assets for Panhandle's use. 

 Eventually, Burd, his wife, and Western entered into an "Agreement for the Sale of
Business Assets," dated May 11, 1998. Thereunder, Western agreed to buy the realty
upon which Panhandle conducted its business and "all office equipment, furniture, office
supplies and inside and outside operating equipment used by Panhandle in its business,"
including several motor vehicles of Panhandle. In exchange for obtaining the assets,
Western issued to Burd 54,310 shares of Western stock (valued at $2.32 a share) and
assumed the payment of various Panhandle debt approximating $66,409.00. Furthermore,
among the assets acquired by Western were some bought by Panhandle with proceeds
from the sale of Tri-State's consigned products. 

 Because Panhandle failed to pay Tri-State for all the products consigned to and sold
by Panhandle, Tri-State sued the company. Eventually, Western was joined in the suit via
an amended petition. The causes of action asserted against Western sounded in
assumpsit and money had and received. Regarding the former, Tri-State alleged, among
other things, that Western 1) "unjustly retained benefits to the loss of" Tri-State, 2)
"acquired real and personal property, equipment and furniture, by unjustly retaining
benefits belonging to" Tri-State, and 3) "sold restricted corporate stock to Burd and
received in exchange money that belonged to" Tri-State. Therefore, it requested that the
trial court "order that . . . Western return the assets unjustly retained or pay a sum of
money such that [Tri-State] will be compensated for its loss . . . ." Regarding the second
cause of action, the company alleged that Western and others "in an unlawful and
unauthorized manner, in derogation of [Tri-State's] rights, had and received $375,413.19,
representing proceeds from the sale of [Tri-State's] consigned products which legally
belonged to [Tri-State], which in equity and good conscience should be returned to" it. 
And, because Western refused to return the "money had and received," it and the other
defendants "are jointly and severally liable to [Tri-State] for . . . $375,431.19 . . . . " 

 Once issue was joined, Western moved for summary judgment. It believed itself
entitled to judgment because 1) Tri-State could not "establish an ownership or security
interest in any property purchased by Western . . . from Panhandle or Burd," 2) any
security interest that Tri-State could establish was "subordinate to Western's . . . interest
in the property sold by Panhandle. . . ," 3) Tri-State could not "establish that Western . . . 
received any 'money' from Panhandle or Burd . . . ," 4) Tri-State could not "establish that
Western . . . holds money which belongs to" it, 5) Tri-State could not "establish any privity
or quasi-contractual relationship between Western . . . " and it, 6) Tri-State could not
"establish that Western . . . was unjustly enriched to the detriment of" it, 7) there was no
evidence that Tri-State had an "ownership or security interest in any property" acquired by
Western, 8) there is no evidence that any security interest of Tri-State was superior to the
ownership interests of Western in the property, and 9) there was no evidence that Tri-State
received "money" from Panhandle or Burd, held "money" belonging to Tri-State, or enjoyed
privity with Western viz any Tri-State funds acquired by Western. Prior to granting the
motion, the trial court sent the parties a letter evincing its intent to do so. Therein, it stated
that it "find['s] that Plaintiff's reliance on 'money had and received' is misplaced." "Since
there is no 'money' or an equivalent thereto involved, there is, as a matter of law, no cause
of action," ruled the trial court. However, the summary judgment it subsequently issued
said nothing about the specific ground upon which it acted. 


Discussion


 1. Evidence of Tri-State's "Money" in the Possession of Western 

 Though not the first ground alleged in the motion for summary judgment, the
question of whether Western received any monies of Tri-State was of import to the trial
court. So, we address it first. And, upon doing so, we conclude that the grounds
implicating that topic did not establish Western's right to judgment as a matter of law.

 Two causes of action were asserted against Western. One involved the general
claim of assumpsit and the other, money had and received. According to legal historians,
assumpsit was developed to redress circumstances involving unjust enrichment or to
"prevent a man from retaining the money of, or some benefit derived from, another which
it is against conscience that he should keep." 1 Chitty on Contracts Ch. 29, p. 843-44
(24th ed. 1977). (1) Furthermore, it encompassed an obligation imposed by law on one to
pay a sum of money or to deliver specific property to another. Id. In time, assumpsit was
divided into various categories. Some of them were known as indebitatus assumpsit,
quantum meruit, quantum valebant, and insimul computassent. 64 Tex. Jur. 3D
Restitution §2 (1989). 

 The chose-in-action for money had and received fell within the scope of indebitatus
assumpsit, 1 Chitty on Contracts Ch. 29, p. 845-46, and encompassed claims for the
return of money. See Staats v. Miller, 243 S.W.2d 686, 687 (Tex. 1951) (stating that all
a plaintiff need show to recover under a claim of money had and received "is that the
defendant holds money which in equity and good conscience belongs to" the plaintiff);
Miller-Rogaska, Inc. v. Bank One, N.A., 931 S.W.2d 655, 662 (Tex. App.--Dallas 1996, no
writ) (stating the same); Gray v. Laketon Wheat Growers, Inc., 240 S.W.2d 353, 356 (Tex.
Civ. App.--Amarillo 1951, no writ) (stating the same). Additionally, the concept of "money"
for purposes of the claim has come to mean more than mere coins or dollar bills. For
instances, various jurisdictions, and at least one Texas intermediate court of appeals, have
indicated that the "equivalent" of money, Gonzales Motor Co. v. Buhidar, 348 S.W.2d 376,
378 (Tex. Civ. App.--Eastland 1961, writ ref'd n.r.e.); Hartman v. Townsend, 523 N.E.2d
199, 202-03 (Ill. App. Ct. 2d Dist. 1988); Gottfried v. Gottfried, 56 N.Y.S.2d 50, 56 (N. Y.
App. Div. 1945), property received as money, Koller v. Shannon County Bank, 74 S.W.2d
271, 274 (Mo. Ct. App. 1934) (promissory notes), or property converted into money before
suit, United States Nat'l Bank v. Miller, 703 P.2d 246, 250 (Or. Ct. App. 1985) (realty
unjustly obtained and then sold for cash) may also be recovered via the cause of action. 
 Yet, overtime, the monikers appended to the old common law causes of action
have fallen by the wayside, as have the "the procedural niceties" related to them. McNair
v. Cedar Park, 993 F.2d 1217, 1220 (5th Cir. 1993). Instead, jurists now focus upon the
facts alleged and recovery sought and thereby categorize the action as one for money had
and received or restitution. Id. In other words, since their inception, old common law
causes of action have mutated, as have their names and procedural technicalities. No
longer do we place much emphasis on the word assumpsit but on the purpose that concept
served. Id. As stated in McNair, the facts involved and the relief requested are
determinative as opposed to the label by which the claim is called. Simply put, the
substance of what is pled controls, not the label or name appended to the claim. And, that
is of import here. 

 While one claim of Tri-State focuses on the recovery of monies had and received,
the other focuses upon the recapture of its assets "unjustly retained" by Western. 
Additionally, Western was "unjustly retaining benefits belonging" to Tri-State because the
benefits and assets alluded to were acquired by Western "with Plaintiff's money wrongfully
obtained by Burd while acting in his capacity as an officer of Panhandle." So, irrespective
of the name appended to the second claim, Tri-State effectively seeks the recovery of its
property wrongfully taken or stolen by Panhandle, converted into another form, and then
transferred to Western. And, Texas jurisprudence has long permitted a true owner of
personalty to do so. McKinney v. Croan, 188 S.W.2d 144, 146 (Tex. 1945) (holding that
"one in rightful possession of personal property may maintain an action for its recovery
against a thief or one holding under him"); Sinclair Houston Fed. Credit Union v. Hendricks,
268 S.W.2d 290, 295 (Tex. Civ. App.--Galveston 1954, writ ref'd n.r.e.) (recognizing the
"general rule" to be "that the owner of stolen property can recover it or its value from
anyone who has received it and exercised dominion over it"). Moreover, that the ultimate
recipient may have acquired the personalty in good faith matters not for the true owner may
still recover it. See Sinclair Houston Fed. Credit Union v. Hendricks, 268 S.W.2d at 295
(stating that the one who receives money, as opposed to other personalty, in good faith
and for valuable consideration can keep it without liability to him from whom it was stolen). 
 This is so because, as to personalty other than money, a thief cannot pass good title. 
McKinney v. Croan, 188 S.W.2d at 146 (stating that a purchaser of property from one who
has obtained it by theft acquires no title to it). 

 Finally, the principles enunciated in McKinney and Sinclair are nothing more than
the reiteration of established rules pertaining to assumpsit and restitution. (2) So, even
though modern jurists may be shying away from the use of archaic terms and "procedural
niceties," one may still invoke historical concepts of assumpsit to recover their personalty
from those who obtained it wrongfully, irrespective of whether the personalty is money or
chattel. So, any contention that Western was entitled to summary judgment simply
because it neither received nor held "money" of Tri-State is incorrect. Tri-State may still
pursue the recovery of its assets, whether monetary or otherwise, which fell into the hands
of third-parties through wrongful means.

 2. No Ownership or Security Interest in Any Property

 We next address the various grounds pertaining to Tri-State's ability to illustrate an
ownership or security interest in property obtained by Western from Panhandle. According
to Western, the existence of any such interests could not be illustrated, and this entitled
it to summary judgment. We disagree. 

 a. Ownership Interest

 Western initially questions the existence of Tri-State's ownership interest in any of
the property it acquired because "Tri-State cites no authority for its contention that if it
owned the cash, it now owns the equipment . . . purchased . . . with the cash." Moreover,
"[t]his contention is unsupported in the law," Western concludes. The argument is of no
consequence. This is so because the owner of personalty wrongfully taken from him may
recoup it, or the proceeds or mutations thereof, from the possession of one who took it, 
Meadows v. Bierschwale, 516 S.W.2d 125, 129 (Tex. 1974), Peirce v. Sheldon Petroleum
Co., 589 S.W.2d 849, 852-53 (Tex. Civ. App.-Amarillo 1979, no writ), or his transferee. 
Austin Lakes Estates, Inc. v. Meyer, 557 S.W.2d 380, 382 (Tex. Civ. App.--Austin 1977,
no writ). Moreover, this remedy exists irrespective of technical legal principles regarding
title and ownership. Southwest Livestock & Trucking Co. v. Dooley, 884 S.W.2d 805, 810
(Tex. App.--San Antonio 1994, writ denied); Peirce v. Sheldon Petroleum Co., 589 S.W.2d
at 853. All that the claimant need do is illustrate that his property can be traced directly into
the asset he seeks. Peirce v. Sheldon Petroleum Co., 589 S.W.2d at 853. (3) So, at the very
least, the owner of stolen property has an interest in the proceeds from that property
sufficient to enable him to recoup those proceeds from their possessor. And, given that,
any argument to the contrary would not warrant summary judgment. 

 a. Security Interest

 Next, Western contended that by virtue of sections 9.109, 9.301 and 9.306 of the
Texas Business and Commerce Code, it took the chattel at issue free of any security
interest that Tri-State may have had in the property. (4) These arguments would be of import
if the relationship between Tri-State and Panhandle viz the consigned goods is one of
buyer, seller, and security interest holder. This is so because article 9 of the Commercial
Code applies to transactions "intended to create a security interest" in personalty. Tex.
Bus. & Com. Code Ann. §9.102(a)(1) (Vernon 1994). And, if the parties merely intended
that the consignment be nothing more than a secured transaction, then, Tri-State would
be obligated to comply with the provisions of article 9. 4 J. White & R. Summers, Uniform
Commercial Code §30-4 (4th ed. 1995); see Tex. Bus. & Com. Code Ann. §1.201(37)(A)
(Vernon 1994) (stating whether a consignment is merely a security agreement depends
upon the intent of the parties). Next, to determine that intent at bar, we must look at the
contract executed by Tri-State and Panhandle. See Hudson Buick, Pontiac, GMC Truck
Co. v. Gooch, 7 S.W.3d 191, 198 (Tex. App.--Tyler 1999, pet. denied) (stating that the
intent of the parties is to be garnered from the contract executed by them). 

 Through that contract, Tri-State and Panhandle agreed that title to the consigned
goods was to remain in Tri-State. So too did they agree that proceeds from the sale of the
goods were to be segregated from Panhandle's funds, that the consigned goods would be
segregated from others possessed by Panhandle, that the latter would notify third-parties
that the segregated items were the "sole property of Tri-State" and "owned by Tri-State,"
that a "UCC Article 9 filing" may be completed to notify Panhandle's "creditors or other
interested persons that Tri-State own[ed] and [had] title to the Products," that no creditor
of Panhandle would have any right or interest in the products, that the risk of loss regarding
the consigned goods would rest with Tri-State (save for loss caused by Panhandle's own
negligence or willful misconduct), that sales were to be made only to customers approved
by Tri-State, that the remuneration Panhandle was to receive consisted of a "monthly
commission," that account receivables and inventory were to "be funded by Tri-State at no
cost to" Panhandle, that Tri-State (as opposed to Panhandle) was to bill customers for the
products they bought, and that Panhandle would keep the products free from all liens and
encumbrances. (Emphasis added). These contractual provisions hardly evince an intent
on the part of either Tri-State or Panhandle to simply vest Tri-State with "an interest in
personal property or fixtures which secures payment or performance of an obligation." 
Tex. Bus. & Com. Code Ann. §1.201(37)(A) (Vernon 1994)(so defining a security interest). 
Rather, they illustrate that Panhandle was acting as an agent for Tri-State, that the latter
was to retain ownership of the products, and that the arrangement was a true consignment. 
See General Elec. Credit Corp. v. Strickland Div. Of Rebel Lumber Co., 437 So. 2d 1240,
1245 (Ala 1983) (holding that the transaction involved a true consignment, as opposed to
a security interest, because the consignee was remunerated on a commission basis and
had no obligation to pay for unsold buildings). So, because the contract between
Panhandle and Tri-State did not evince the creation of a mere security agreement, the
rules applicable to such agreements and their priorities found in article 9 have no
application to the dispute at bar. Id. at 1244; 4 J. White & R. Summers, Uniform
Commercial Code §30-4 (stating that if the court determines that the consignment is
actually a security agreement, then the consignor must protect his interest via compliance
with article 9 but if it is not a security agreement, then the consignor protects his interest
via compliance with §2.326(c)(a) or (b)). 


 b. Title of Consigned Goods Passed to Western

 Next, Western posited that Tri-State lacked any interest in the property purchased
from the proceeds of the sale of the consigned goods because title to the consigned goods
vested in Panhandle. It based the contention upon §2.326(c) of the Texas Business and
Commerce Code. Prior to its 1999 amendment by the Texas legislature, the section
stated, in pertinent part, that:

 Where goods are delivered to a person for sale and such person maintains
a place of business at which he deals in goods of the kind involved, under a
name other than the name of the person making delivery, then with respect
to claims of creditors of the person conducting the business the goods
aredeemed to be sale or return . . . .


Tex. Bus. & Com. Code Ann. §2.326(c) (Vernon 1994) (emphasis added). This provision
was enacted to clarify the nature of a consignment with respect to claims of creditors of the
consignee. Id. at comment 2. "As against such creditors words [like] 'on consignment' or
'on memorandum' with or without words of reservation of title in the seller, are disregarded
when the buyer has a place of business at which he deals in goods of the kind involved." 
Id. Admittedly, there are exceptions to the rule; yet, it is obvious that before the rule can
come into play a creditor must intervene. Fuller v. Texas Western Fin. Corp., 644 S.W.2d
442, 443 (Tex. 1982); Brashear v. D Cross B, Inc., 711 S.W.2d 749, 750 (Tex. App.--Fort
Worth 1986, writ ref'd n.r.e.) (stating that the agreement of a consignor and consignee is
not effective against a creditor). In other words, creditors of the consignee enjoy the
protection afforded by §2.326(c), not the original parties of the consignment or their
assignees. Brashear v. D Cross B, Inc., 711 S.W.2d at 750-51. And, this is of import
because, at the very least, there appears to be a material question of fact regarding
whether Western was an assignee (purchaser) of Panhandle's chattel and realty or a
creditor of the consignee. Again, Western took the property at issue via an agreement to
purchase a substantial portion of the assets utilized by Panhandle in its business. A
transaction of that ilk likens more to an assignment or conveyance of a business rather
than to a credit transaction. See Luecke v. Wallace, 951 S.W.2d 267, 273 (Tex.
App.-Austin 1997, no writ) (stating that the word "'assigns' includes those individuals who
take property 'either immediately or remotely from or under the assignor, whether by
conveyance, devise, descent, or act of law.'"). (5) And, Western likens more to one buying
a business and its assets than to a creditor. (6) So, it cannot be said, as a matter of law, that
§2.326(c) of the Business and Commerce Code somehow insulated the property bought
by Western from the claims of Tri-State for Western may not be a "creditor" as
contemplated by the statute. 

 3. Inability to Trace

 Western next contends that it was entitled to summary judgment because none of
the stolen assets of Tri-State could be traced into its hands. In so arguing, however, it
does not address the deposition testimony of Burd. This is of import since Burd,
Panhandle's president at the time, stated under oath that proceeds from the sale of the
consigned goods were used to acquire specific chattel which he identified and which was
subsequently transferred to Western. Furthermore, the chattel purchased with those
proceeds included office equipment and at least one motor vehicle. It may well be that a
fact-finder would discredit the testimony. Yet, that does not matter when the setting is one
of summary judgment for there the trial court cannot make credibility determinations. 
Johnston v. American Med. Int'l, 36 S.W.3d 572, 575 (Tex. App.--Tyler 2000, no pet.). So
to the extent that some evidence of record illustrated that proceeds from the consigned
products could be traced into the hands of Western, the contention that no such property
could be so traced did not warrant summary judgment. See Peirce v. Sheldon Petroleum
Co., 589 S.W.2d at 853 (stating that when the beneficiary can point to the specific property
that was purchased or its mutation the tracing burden was met). 

 4. Lack of Privity

 Next, Western contended that summary judgment was warranted because no privity
existed between it and Tri-State. Same is required before one can use the theory of
money had and received to recoup property from another, according to Western. We
disagree.

 Assuming arguendo that privity is an element of Tri-State's causes of action, (7) the
law implies the requisite privity when the stolen property is found in the hands of the
defendant. Webster v. Sterling Fin. Co., 173 S.W.2d 928, 931 (Mo. 1943); see Friar v.
Vanguard Holding Corp., 434 N.Y.S.2d 698, 702 (App. Div. 1980) (stating that no privity
of contract is required except that which results from the circumstances of the case and
whether the defendant's original possession of the money is rightful or wrongful is
immaterial). It is undoubtedly for this reason that authority permits the recovery of stolen
property or its proceeds from those who originally took it and their transferees, Austin
Lakes Estates, Inc. v. Meyer, 557 S.W.2d at 382, Sinclair Houston Fed. Credit Union v.
Hendricks, 268 S.W.2d at 295 (stating that the property can be recovered from "anyone
who has received it"), even if the transferee is a good faith purchaser for value. Sinclair
Houston Fed. Credit Union v. Hendricks, 268 S.W.2d at 295; Restatement of Restitution,
Quasi Contracts & Constructive Trusts §128 cmt c, Illus. 3 & 4, cmt f; McKinney v. Croan,
188 S.W.2d at 146 (holding that the owner of the stolen car could recover it from the
individual who bought it for "valuable consideration" from the thief). Here, again, the record
contains evidence of theft of monies, conversion of the stolen funds into specific chattel,
and the delivery of that chattel to Western. Thus, some evidence appeared of record from
which a fact-finder could infer privity as contemplated by the Restatement of Restitution,
McKinney, Sinclair, Austin Lakes, Friar, and Webster.

 5. No Unjust Enrichment

 Western next argued that it was entitled to summary judgment because it was not
unjustly enriched. Furthermore, it purportedly was not unjustly enriched because it gave
value for what it received. We disagree.

 Simply put, the unjust enrichment for purposes of restitution and assumpsit comes
by way of receiving that which actually belongs to another. It does not matter that the
ultimate recipient paid value for the chattel as illustrated in McKinney, Sinclair, and the
Restatement of Restitution. 

 

 6. No Evidence

 Finally, Western argued that it was entitled to summary judgment because Tri-State
had no evidence to establish various elements of its claims. The elements mentioned
happened to be those which we addressed above. And, in addressing them above, we
illustrated that they were either not aspects of Tri-State's causes of action or that the
record contained some evidence upon which a jury could reasonably infer that they
existed. Thus, the trial court was not authorized to grant summary judgment upon
Western's claims of no evidence.

 For the reasons stated above, we reverse the summary judgment and remand the
cause for further proceedings.


 Brian Quinn

 Justice




Publish.


1. The common law theory of assumpsit apparently had and has a sister in equity. Like assumpsit, the
equitable principles also evolved from the desire to remedy unjust enrichment. 1 Chitty on Contracts Ch.
29, p. 844-45 (24th ed. 1977). However, both the common law and equitable theories are now categorized
under the general label of restitution, though each had distinct components and limitations. Id. 
2. Long ago, it was recognized that either a claim of restitution or assumpsit was available to one
attempting to recoup property stolen from him and sold to innocent third-parties. Restatement of Restitution,
Quasi-Contracts, & Constructive Trusts §128 cmt c, illus. 3, 4, 5, & 6 (1937).
3. Tri-State cites us to the deposition testimony of Burd wherein the latter states that funds belonging
to Tri-State were used to buy various assets subsequently transferred to Western. Thus, at the very least,
there existed a material issue of fact regarding Tri-State's ability to trace its alleged property into the hands
of Western.
4. Since the provisions of the Business and Commerce Code relied upon by Western were those in
existence prior to the legislative changes of 1999, we too restrict our analysis to those provisions. Whether
the amendments would apply to the dispute at bar or whether they would warrant a different result are
questions not before us at this time. 
5. Indeed, though Western invokes §2.326(c), it neither argued nor attempted to illustrate that it was
a creditor of Panhandle. 
6. According to the Texas Business and Commerce Code, a creditor includes a general, secured, or
lien creditor or their representatives. Tex. Bus. & Com. Code Ann. §1.201(12) (Vernon 1994). The term also
connotes one to whom money, a debt or a claim is owed. Black's Law Dictionary 368-69 (6th ed. 1990). 
7. At least one commentator suggests that "the notion of 'privity' is unnecessary" since the cause of
action involves a promise implied by law as opposed to one arising by consent. 1 Chitty on Contracts Ch.
29, p. 851 (24th ed. 1977).