NO. 07-08-0012-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

AUGUST 20, 2009
______________________________

SUNDANCE RESOURCES, INC., 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellant

v.

OLE BROOK ENERGY SERVICES, INC., 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
_________________________________

FROM THE 413TH DISTRICT COURT OF JOHNSON COUNTY;

NO. C200700069; HON. WILLIAM C. BOSWORTH, JR., PRESIDING
_______________________________

Memorandum Opinion
_______________________________

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
Â Â Â Â Â Â Â Â Â Â Sundance Resources, Inc. (Sundance) appealed from a summary judgment granted
in favor of Ole Brook Energy Services, Inc. (Ole Brook) for money owed under a contract
for oil well services and materials. Though fourteen issues were raised by Sundance, we
address only two because they are dispositive. The first concerned the trial courtâs refusal
to sustain Sundanceâs special exceptions to the motion for summary judgment. The
second involved whether Ole Brook established, as a matter of law, that it had contracted
with Sundance. And, upon considering those issues, we reverse the summary judgment.
Â Â Â Â Â Â Â Â Â Â The dispute before us arose from Ole Brookâs alleged provision of well services to
Sundance and the latterâs responsibility to pay for them. Though Sundance was alleged
to be the owner of the property in question, the contracts (work orders) proffered by Ole
Brook name other entities as the contracting parties and recipient of the services
undertaken. Ole Brook moved for summary judgment against Sundance and attempted
to ameliorate this discrepancy regarding the actual parties to the contract by having its
âagentâ attest that while the documents name other entities, the contracts are âin fact
between Ole Brook . . . and Sundance Resources, Inc.â
Â Â Â Â Â Â Â Â Â Â In response to the motion, Sundance uttered, in writing, various special exceptions
to it. The trial court overruled those exceptions, granted the motion, awarded Ole Brook
approximately $284,000 in damages, $94,000 in attorneyâs fees, and foreclosure upon its
purported mechanics and materialmenâs lien. Thereafter, Sundance appealed. 
Â Â Â Â Â Â Â Â Â Â Special Exceptions
Â Â Â Â Â Â Â Â Â Â Sundance initially complained of the trial courtâs failure to grant its special
exceptions to the motion for summary judgment. Through those exceptions, it asserted
that Ole Brook âalleged four separate causes of actions/claims in its petitionâ and that it
âhas failed to identify the elements of any of its claims, and . . . failed to cite any authority
as the basis for which it moved for summary judgment.â We sustain the issue.
Â Â Â Â Â Â Â Â Â Â Whether the trial court erred in overruling the exceptions depends on whether it
abused its discretion. Baylor University v. Sonnichsen, 221 S.W.3d 632, 635 (Tex. 2007).
We also note that a motion for summary judgment must state the specific grounds upon
which it is sought. Tex. R. Civ. P. 166a(c); Clement v. City of Plano, 26 S.W.3d 544, 549
(Tex. App.âDallas 2000), overruled on other grounds by Telthorster v. Tennell, 92 S.W.3d
457 (Tex. 2002). Those grounds must be expressly stated in the motion itself and not in
the brief (unless the brief is incorporated into the motion) or in the summary judgment
evidence. Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 912 (Tex. 1997);
Madisonville State Bank v. Canterbury, Stuber, Elder, Gooch & Surratt, P.C., 209 S.W.3d
254, 259 (Tex. App.âDallas 2006, no pet.). Â 
Â Â Â Â Â Â Â Â Â Â Ole Brookâs original petition encompassed allegations involving breached contract,
sworn account, lien foreclosure, and the recovery of attorneyâs fees. However, via its
summary judgment, Ole Brook merely alleged the existence of a contract between it and
Sundance and that pursuant to the contract, Sundance became obligated to pay it a
specific amount of money upon which there remained an unpaid balance. It did not state
the basis upon which it sought summary judgment, that is, whether it was seeking recovery
via a sworn account or through a claim of breach of contract. Nor did it address either the
element underlying a claim for breached contract or illustrate that it performed as required.


 
See Clement v. City of Plano, 26 S.W.3d at 550 (finding the motion insufficient to support
summary judgment when the movant failed to identify or address the elements of its
affirmative defense in its motion as opposed to its brief). Thus, Ole Brookâs motion failed
to specifically set forth the grounds for summary judgment, and the trial court abused its
discretion in failing to sustain the special exceptions.
Â Â Â Â Â Â Â Â Â Â Party to the Contracts
Â Â Â Â Â Â Â Â Â Â Sundance also posited that a material question of fact existed as to whether it was
a party to and liable under the contracts at issue. As previously mentioned, the documents
named other entities as the obligors, though Sundance was mentioned as the property
owner. Furthermore, Sundance, via the affidavit of its chief operating officer, stated that
it was neither affiliated nor in privity with the named obligors. And, while Ole Brookâs agent
stated that Sundance was actually the contracting party, his statement was conclusory. 
Eberstein v. Hunter, 260 S.W.3d 626, 630 (Tex. App.âDallas 2008, no pet.) (stating that
conclusory factual statements are not competent summary judgment evidence). No effort
was made to explain how the names of the other entities came to appear on the contracts
if Sundance was truly the responsible party. In sum, and at the very least, there existed
a material issue of fact regarding the identity of the contractual obligors, and because one
existed, the trial court could not enter summary judgment for Ole Brook as a matter of law.
Â Â Â Â Â Â Â Â Â Â Accordingly, the final summary judgment is reversed and the cause is remanded.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Brian Quinn
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Chief Justice



s jurisprudence has long permitted a true owner of
personalty to do so. McKinney v. Croan, 188 S.W.2d 144, 146 (Tex. 1945) (holding that
"one in rightful possession of personal property may maintain an action for its recovery
against a thief or one holding under him"); Sinclair Houston Fed. Credit Union v. Hendricks,
268 S.W.2d 290, 295 (Tex. Civ. App.--Galveston 1954, writ ref'd n.r.e.) (recognizing the
"general rule" to be "that the owner of stolen property can recover it or its value from
anyone who has received it and exercised dominion over it"). Moreover, that the ultimate
recipient may have acquired the personalty in good faith matters not for the true owner may
still recover it. See Sinclair Houston Fed. Credit Union v. Hendricks, 268 S.W.2d at 295
(stating that the one who receives money, as opposed to other personalty, in good faith
and for valuable consideration can keep it without liability to him from whom it was stolen). 
 This is so because, as to personalty other than money, a thief cannot pass good title. 
McKinney v. Croan, 188 S.W.2d at 146 (stating that a purchaser of property from one who
has obtained it by theft acquires no title to it). 

 Finally, the principles enunciated in McKinney and Sinclair are nothing more than
the reiteration of established rules pertaining to assumpsit and restitution. (2) So, even
though modern jurists may be shying away from the use of archaic terms and "procedural
niceties," one may still invoke historical concepts of assumpsit to recover their personalty
from those who obtained it wrongfully, irrespective of whether the personalty is money or
chattel. So, any contention that Western was entitled to summary judgment simply
because it neither received nor held "money" of Tri-State is incorrect. Tri-State may still
pursue the recovery of its assets, whether monetary or otherwise, which fell into the hands
of third-parties through wrongful means.

 2. No Ownership or Security Interest in Any Property

 We next address the various grounds pertaining to Tri-State's ability to illustrate an
ownership or security interest in property obtained by Western from Panhandle. According
to Western, the existence of any such interests could not be illustrated, and this entitled
it to summary judgment. We disagree. 

 a. Ownership Interest

 Western initially questions the existence of Tri-State's ownership interest in any of
the property it acquired because "Tri-State cites no authority for its contention that if it
owned the cash, it now owns the equipment . . . purchased . . . with the cash." Moreover,
"[t]his contention is unsupported in the law," Western concludes. The argument is of no
consequence. This is so because the owner of personalty wrongfully taken from him may
recoup it, or the proceeds or mutations thereof, from the possession of one who took it, 
Meadows v. Bierschwale, 516 S.W.2d 125, 129 (Tex. 1974), Peirce v. Sheldon Petroleum
Co., 589 S.W.2d 849, 852-53 (Tex. Civ. App.-Amarillo 1979, no writ), or his transferee. 
Austin Lakes Estates, Inc. v. Meyer, 557 S.W.2d 380, 382 (Tex. Civ. App.--Austin 1977,
no writ). Moreover, this remedy exists irrespective of technical legal principles regarding
title and ownership. Southwest Livestock & Trucking Co. v. Dooley, 884 S.W.2d 805, 810
(Tex. App.--San Antonio 1994, writ denied); Peirce v. Sheldon Petroleum Co., 589 S.W.2d
at 853. All that the claimant need do is illustrate that his property can be traced directly into
the asset he seeks. Peirce v. Sheldon Petroleum Co., 589 S.W.2d at 853. (3) So, at the very
least, the owner of stolen property has an interest in the proceeds from that property
sufficient to enable him to recoup those proceeds from their possessor. And, given that,
any argument to the contrary would not warrant summary judgment. 

 a. Security Interest

 Next, Western contended that by virtue of sections 9.109, 9.301 and 9.306 of the
Texas Business and Commerce Code, it took the chattel at issue free of any security
interest that Tri-State may have had in the property. (4) These arguments would be of import
if the relationship between Tri-State and Panhandle viz the consigned goods is one of
buyer, seller, and security interest holder. This is so because article 9 of the Commercial
Code applies to transactions "intended to create a security interest" in personalty. Tex.
Bus. & Com. Code Ann. §9.102(a)(1) (Vernon 1994). And, if the parties merely intended
that the consignment be nothing more than a secured transaction, then, Tri-State would
be obligated to comply with the provisions of article 9. 4 J. White & R. Summers, Uniform
Commercial Code Â§30-4 (4th ed. 1995); see Tex. Bus. & Com. Code Ann. Â§1.201(37)(A)
(Vernon 1994) (stating whether a consignment is merely a security agreement depends
upon the intent of the parties). Next, to determine that intent at bar, we must look at the
contract executed by Tri-State and Panhandle. See Hudson Buick, Pontiac, GMC Truck
Co. v. Gooch, 7 S.W.3d 191, 198 (Tex. App.--Tyler 1999, pet. denied) (stating that the
intent of the parties is to be garnered from the contract executed by them). 

 Through that contract, Tri-State and Panhandle agreed that title to the consigned
goods was to remain in Tri-State. So too did they agree that proceeds from the sale of the
goods were to be segregated from Panhandle's funds, that the consigned goods would be
segregated from others possessed by Panhandle, that the latter would notify third-parties
that the segregated items were the "sole property of Tri-State" and "owned by Tri-State,"
that a "UCC Article 9 filing" may be completed to notify Panhandle's "creditors or other
interested persons that Tri-State own[ed] and [had] title to the Products," that no creditor
of Panhandle would have any right or interest in the products, that the risk of loss regarding
the consigned goods would rest with Tri-State (save for loss caused by Panhandle's own
negligence or willful misconduct), that sales were to be made only to customers approved
by Tri-State, that the remuneration Panhandle was to receive consisted of a "monthly
commission," that account receivables and inventory were to "be funded by Tri-State at no
cost to" Panhandle, that Tri-State (as opposed to Panhandle) was to bill customers for the
products they bought, and that Panhandle would keep the products free from all liens and
encumbrances. (Emphasis added). These contractual provisions hardly evince an intent
on the part of either Tri-State or Panhandle to simply vest Tri-State with "an interest in
personal property or fixtures which secures payment or performance of an obligation." 
Tex. Bus. & Com. Code Ann. Â§1.201(37)(A) (Vernon 1994)(so defining a security interest). 
Rather, they illustrate that Panhandle was acting as an agent for Tri-State, that the latter
was to retain ownership of the products, and that the arrangement was a true consignment. 
See General Elec. Credit Corp. v. Strickland Div. Of Rebel Lumber Co., 437 So. 2d 1240,
1245 (Ala 1983) (holding that the transaction involved a true consignment, as opposed to
a security interest, because the consignee was remunerated on a commission basis and
had no obligation to pay for unsold buildings). So, because the contract between
Panhandle and Tri-State did not evince the creation of a mere security agreement, the
rules applicable to such agreements and their priorities found in article 9 have no
application to the dispute at bar. Id. at 1244; 4 J. White & R. Summers, Uniform
Commercial Code Â§30-4 (stating that if the court determines that the consignment is
actually a security agreement, then the consignor must protect his interest via compliance
with article 9 but if it is not a security agreement, then the consignor protects his interest
via compliance with Â§2.326(c)(a) or (b)). 


 b. Title of Consigned Goods Passed to Western

 Next, Western posited that Tri-State lacked any interest in the property purchased
from the proceeds of the sale of the consigned goods because title to the consigned goods
vested in Panhandle. It based the contention upon Â§2.326(c) of the Texas Business and
Commerce Code. Prior to its 1999 amendment by the Texas legislature, the section
stated, in pertinent part, that:

 Where goods are delivered to a person for sale and such person maintains
a place of business at which he deals in goods of the kind involved, under a
name other than the name of the person making delivery, then with respect
to claims of creditors of the person conducting the business the goods
aredeemed to be sale or return . . . .


Tex. Bus. & Com. Code Ann. Â§2.326(c) (Vernon 1994) (emphasis added). This provision
was enacted to clarify the nature of a consignment with respect to claims of creditors of the
consignee. Id. at comment 2. "As against such creditors words [like] 'on consignment' or
'on memorandum' with or without words of reservation of title in the seller, are disregarded
when the buyer has a place of business at which he deals in goods of the kind involved." 
Id. Admittedly, there are exceptions to the rule; yet, it is obvious that before the rule can
come into play a creditor must intervene. Fuller v. Texas Western Fin. Corp., 644 S.W.2d
442, 443 (Tex. 1982); Brashear v. D Cross B, Inc., 711 S.W.2d 749, 750 (Tex. App.--Fort
Worth 1986, writ ref'd n.r.e.) (stating that the agreement of a consignor and consignee is
not effective against a creditor). In other words, creditors of the consignee enjoy the
protection afforded by Â§2.326(c), not the original parties of the consignment or their
assignees. Brashear v. D Cross B, Inc., 711 S.W.2d at 750-51. And, this is of import
because, at the very least, there appears to be a material question of fact regarding
whether Western was an assignee (purchaser) of Panhandle's chattel and realty or a
creditor of the consignee. Again, Western took the property at issue via an agreement to
purchase a substantial portion of the assets utilized by Panhandle in its business. A
transaction of that ilk likens more to an assignment or conveyance of a business rather
than to a credit transaction. See Luecke v. Wallace, 951 S.W.2d 267, 273 (Tex.
App.-Austin 1997, no writ) (stating that the word "'assigns' includes those individuals who
take property 'either immediately or remotely from or under the assignor, whether by
conveyance, devise, descent, or act of law.'"). (5) And, Western likens more to one buying
a business and its assets than to a creditor. (6) So, it cannot be said, as a matter of law, that
Â§2.326(c) of the Business and Commerce Code somehow insulated the property bought
by Western from the claims of Tri-State for Western may not be a "creditor" as
contemplated by the statute. 

 3. Inability to Trace

 Western next contends that it was entitled to summary judgment because none of
the stolen assets of Tri-State could be traced into its hands. In so arguing, however, it
does not address the deposition testimony of Burd. This is of import since Burd,
Panhandle's president at the time, stated under oath that proceeds from the sale of the
consigned goods were used to acquire specific chattel which he identified and which was
subsequently transferred to Western. Furthermore, the chattel purchased with those
proceeds included office equipment and at least one motor vehicle. It may well be that a
fact-finder would discredit the testimony. Yet, that does not matter when the setting is one
of summary judgment for there the trial court cannot make credibility determinations. 
Johnston v. American Med. Int'l, 36 S.W.3d 572, 575 (Tex. App.--Tyler 2000, no pet.). So
to the extent that some evidence of record illustrated that proceeds from the consigned
products could be traced into the hands of Western, the contention that no such property
could be so traced did not warrant summary judgment. See Peirce v. Sheldon Petroleum
Co., 589 S.W.2d at 853 (stating that when the beneficiary can point to the specific property
that was purchased or its mutation the tracing burden was met). 

 4. Lack of Privity

 Next, Western contended that summary judgment was warranted because no privity
existed between it and Tri-State. Same is required before one can use the theory of
money had and received to recoup property from another, according to Western. We
disagree.

 Assuming arguendo that privity is an element of Tri-State's causes of action, (7) the
law implies the requisite privity when the stolen property is found in the hands of the
defendant. Webster v. Sterling Fin. Co., 173 S.W.2d 928, 931 (Mo. 1943); see Friar v.
Vanguard Holding Corp., 434 N.Y.S.2d 698, 702 (App. Div. 1980) (stating that no privity
of contract is required except that which results from the circumstances of the case and
whether the defendant's original possession of the money is rightful or wrongful is
immaterial). It is undoubtedly for this reason that authority permits the recovery of stolen
property or its proceeds from those who originally took it and their transferees, Austin
Lakes Estates, Inc. v. Meyer, 557 S.W.2d at 382, Sinclair Houston Fed. Credit Union v.
Hendricks, 268 S.W.2d at 295 (stating that the property can be recovered from "anyone
who has received it"), even if the transferee is a good faith purchaser for value. Sinclair
Houston Fed. Credit Union v. Hendricks, 268 S.W.2d at 295; Restatement of Restitution,
Quasi Contracts & Constructive Trusts Â§128 cmt c, Illus. 3 & 4, cmt f; McKinney v. Croan,
188 S.W.2d at 146 (holding that the owner of the stolen car could recover it from the
individual who bought it for "valuable consideration" from the thief). Here, again, the record
contains evidence of theft of monies, conversion of the stolen funds into specific chattel,
and the delivery of that chattel to Western. Thus, some evidence appeared of record from
which a fact-finder could infer privity as contemplated by the Restatement of Restitution,
McKinney, Sinclair, Austin Lakes, Friar, and Webster.

 5. No Unjust Enrichment

 Western next argued that it was entitled to summary judgment because it was not
unjustly enriched. Furthermore, it purportedly was not unjustly enriched because it gave
value for what it received. We disagree.

 Simply put, the unjust enrichment for purposes of restitution and assumpsit comes
by way of receiving that which actually belongs to another. It does not matter that the
ultimate recipient paid value for the chattel as illustrated in McKinney, Sinclair, and the
Restatement of Restitution. 

 

 6. No Evidence

 Finally, Western argued that it was entitled to summary judgment because Tri-State
had no evidence to establish various elements of its claims. The elements mentioned
happened to be those which we addressed above. And, in addressing them above, we
illustrated that they were either not aspects of Tri-State's causes of action or that the
record contained some evidence upon which a jury could reasonably infer that they
existed. Thus, the trial court was not authorized to grant summary judgment upon
Western's claims of no evidence.

 For the reasons stated above, we reverse the summary judgment and remand the
cause for further proceedings.


 Brian Quinn

 Justice




Publish.


1. The common law theory of assumpsit apparently had and has a sister in equity. Like assumpsit, the
equitable principles also evolved from the desire to remedy unjust enrichment. 1 Chitty on Contracts Ch.
29, p. 844-45 (24th ed. 1977). However, both the common law and equitable theories are now categorized
under the general label of restitution, though each had distinct components and limitations. Id. 
2. Long ago, it was recognized that either a claim of restitution or assumpsit was available to one
attempting to recoup property stolen from him and sold to innocent third-parties. Restatement of Restitution,
Quasi-Contracts, & Constructive Trusts Â§128 cmt c, illus. 3, 4, 5, & 6 (1937).
3. Tri-State cites us to the deposition testimony of Burd wherein the latter states that funds belonging
to Tri-State were used to buy various assets subsequently transferred to Western. Thus, at the very least,
there existed a material issue of fact regarding Tri-State's ability to trace its alleged property into the hands
of Western.
4. Since the provisions of the Business and Commerce Code relied upon by Western were those in
existence prior to the legislative changes of 1999, we too restrict our analysis to those provisions. Whether
the amendments would apply to the dispute at bar or whether they would warrant a different result are
questions not before us at this time. 
5. Indeed, though Western invokes Â§2.326(c), it neither argued nor attempted to illustrate that it was
a creditor of Panhandle. 
6. According to the Texas Business and Commerce Code, a creditor includes a general, secured, or
lien creditor or their representatives. Tex. Bus. & Com. Code Ann. Â§1.201(12) (Vernon 1994). The term also
connotes one to whom money, a debt or a claim is owed. Black's Law Dictionary 368-69 (6th ed. 1990). 
7. At least one commentator suggests that "the notion of 'privity' is unnecessary" since the cause of
action involves a promise implied by law as opposed to one arising by consent. 1 Chitty on Contracts Ch.
29, p. 851 (24th ed. 1977).